*Jasmine Leah Gambino v. State of Maryland*, No.0349, September Term, 2024.  Opinion by Nazarian, J.

**CRIMINAL LAW – SUFFICIENCY OF THE EVIDENCE**

The evidence was sufficient to support the defendant's convictions for making a false statement to law enforcement under Md. Code (2002, 2021 Repl. Vol.), § 9-501 of the Criminal Law Article and for contributing to a condition rendering a child in need of assistance ("CINA") under Md. Code (1974, 2020 Repl. Vol.), § 3-828 of the Courts & Judicial Proceedings Article. A reasonable jury could conclude that the defendant made a false statement to a law enforcement officer where she made the offending statement in response to a question from a social worker while aware that the officer was also present. A reasonable jury could conclude also that the defendant contributed to a condition rendering a CINA where she coached her child into making false allegations of sexual abuse against the child's father; subjected the child to three forensic interviews and a forensic medical examination; filmed herself questioning the child multiple times about the alleged sexual abuse against the advice of Child Protective Services ("CPS"); argued frequently with the child's father in the child's presence; threatened to report the child's father to CPS if he didn't pay certain expenses; and filed for a temporary protective order against the child's father on the child's behalf that deprived the child's father of custody temporarily.

**CRIMINAL LAW – EVIDENCE – MOTION TO SUPPRESS – WARRANT REQUIREMENT FOR SEARCHES AND SEIZURES – EXCEPTIONS – EXIGENT CIRCUMSTANCES**

Exigent circumstances justified the warrantless seizure of the defendant's cell phone to prevent the imminent alteration or destruction of evidence where the defendant showed a detective videos that she had saved on the cell phone of her child making disclosures of sexual abuse. Under these circumstances, the detective reasonably could have believed that the defendant, who was aware that he wanted the videos as evidence and whom he had no basis for detaining, would delete the videos if he permitted her to leave with the cell phone.

**CRIMINAL LAW – EVIDENCE – MOTION TO SUPPRESS – EXECUTION OF SEARCH WARRANT – REASONABLENESS OF DELAY**

A twenty-one-day delay between the lawful seizure of the defendant's cell phone and the execution of a warrant to search the phone was reasonable and did not render the seizure unconstitutional where there was evidence that the delay was caused by limited manpower and not by a lack of diligence by the executing officers, and where the defendant diminished her possessory interest in the phone by revealing its contents to law enforcement.

**CRIMINAL LAW – EVIDENCE – MOTION TO SUPPRESS – EXCLUSIONARY RULE – EXCEPTIONS – GOOD FAITH**

The good faith exception to the exclusionary rule applied where the search warrant for the defendant's cell phone authorized officers to seize files with associated dates inside a specified range; officers input the date range from the warrant into the forensic examination software; and the software included a video with associated dates outside the scope of the warrant in the narrowed set of files responsive to the officers' prompt.

**WITNESS CREDIBILITY – BOLSTERING**

Testimony by a detective that he did not find the defendant's allegations of sexual abuse against her child's father to be credible was not improper bolstering testimony that infringed on the jury's function of assessing witness credibility. The detective was not opining on the defendant's credibility as a witness but was rather giving a factual explanation of his reasons for ceasing his investigation into her child's father to rehabilitate his own credibility after defense counsel attempted to impeach him.

**INTERCEPTED COMMUNICATIONS – ADMISSIBILITY**

A video recording of an argument between the defendant and her child's father was not inadmissible as a matter of law under Md. Code (1974, 2020 Repl. Vol.), § 10-402 of the Courts & Judicial Proceedings Article, Maryland's Wiretap Act. The defendant consented implicitly to the interception of the communication when she saw her child's father recording and took no action to stop him from doing so.

**POST-TRIAL MOTIONS – MOTION FOR A NEW TRIAL – NEWLY DISCOVERED EVIDENCE – MATERIALITY**

The circuit court did not abuse its discretion when it denied the defendant's motion for a new trial based on newly discovered evidence. Evidence that a social worker who testified at the defendant's trial had provided false testimony and documentation in unrelated cases was mere impeachment evidence and was not material to the outcome of the trial.

**CRIMINAL PROCEDURE – DUE PROCESS – ACCESS TO EXCULPATORY EVIDENCE**

The circuit court did not abuse its discretion when it quashed the subpoena the defendant served on Child Protective Services to obtain records related to the agency's investigation into a social worker who testified at her trial. The defendant was not entitled to inspect the records because she failed to demonstrate a genuine need that outweighed Maryland's compelling interest in protecting its child-abuse information.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 349

September Term, 2024

_____

JASMINE LEAH GAMBINO

v.

STATE OF MARYLAND

_____

Nazarian,
Beachley,*
Harrell, Glenn T., Jr.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: March 17, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

* Beachley, J., now retired, participated in the hearing and conference of this case while an active member of this Court. He participated in the adoption of this opinion after being recalled pursuant to Maryland Constitution, Article IV, Section 3A.

Jasmine Leah Gambino, a licensed clinical social worker, is the mother of R.W., a minor child. Between March 25 and May 10, 2023, Ms. Gambino reported multiple times—to police, Child Protective Services ("CPS"), and medical professionals—that R was disclosing instances of sexual abuse by her father, T.W.; she filed for a protective order against T on R's behalf; she took R for three forensic interviews; and she brought R in for a forensic medical examination. After CPS investigated these reports and determined they were unfounded, Ms. Gambino was charged with, and convicted by a jury in the Circuit Court for Montgomery County, of making a false statement to law enforcement and contributing to a condition rendering a child in need of assistance.

Ms. Gambino appeals and argues that the evidence was insufficient to sustain her convictions, that the court erred when it denied her motion to suppress evidence obtained from her cellphone after police seized it without a warrant, that the court abused its discretion when it allowed the detective assigned to investigate T to testify that he closed his investigation because he didn't find the abuse allegations credible, that the court violated Maryland's Wiretap Act when it admitted a recording of an argument between her and T, and that the court abused its discretion when it denied her motion for a new trial based on new evidence that a CPS social worker involved in R's case provided inaccurate information in unrelated cases. We affirm.

## I. BACKGROUND

In December 2018, when R was one year old, Ms. Gambino separated from R's father, T, and moved out of their shared home in Silver Spring. The two agreed, without court intervention, to share custody of R equally. After they separated, Ms. Gambino and

T brought R to the pediatrician on several occasions after she began to suffer from redness and irritation in her genital area. On two such occasions, once in 2019 and once in 2021, Ms. Gambino told the pediatrician that she was concerned that R's condition could be a result of sexual abuse. She did not follow up with the police or CPS after these visits.

In January 2023, Ms. Gambino moved back in with T temporarily due to a pest problem at her apartment, but moved out again in late March after an argument during which she accused T of sexually abusing R. The events that followed led to Ms. Gambino's arrest on July 26, 2023.

Ms. Gambino was charged on the day of her arrest with two counts: Count I, sex abuse of a minor, and Count II, sex offense in the third degree. On August 23, 2023, the State charged Ms. Gambino by information with two additional counts: Count III, contributing to a condition rendering a child in need of assistance ("CINA"), and Count IV, making a false statement to a law enforcement officer. Two days later, the State dismissed Counts I and II voluntarily. Ms. Gambino entered a Demand for Jury Trial on September 15, 2023. On that same day, the case came before the Circuit Court for Montgomery County. Her trial lasted three days. The State put on seven witnesses and introduced twenty-four exhibits as part of its case-in-chief. Ms. Gambino testified in her own defense. We summarize the testimony here and provide additional facts in our Discussion where relevant.

T testified that Ms. Gambino first accused him of sexually abusing R in 2019, when R was one year old. He testified that Ms. Gambino told him R's genital area was red and irritated and showed him a video she'd recorded while asking R about the source of the

irritation. The State admitted this video, recorded on September 6, 2019, into evidence. The video shows Ms. Gambino asking R "Who hurt it?" and "Who touched you?" several times. R refused to answer until Ms. Gambino offered to give her a cookie if she told her who touched her, at which point R responded "Daddy." T said that he denied Ms. Gambino's accusation and that when they took R to the pediatrician for an evaluation, the doctor advised them that the soap they were using to bathe R might be the cause of the irritation. T asserted that he and Ms. Gambino took R to the pediatrician "five times over six years" to have her examined for redness and irritation in her genital area, and each time the doctors said there were "no ongoing issues" and attributed the irritation to the soap they used to bathe her, to diaper rash, or to "her sitting in the water, bathing too long, playing with her toys."

T testified further that sometime in late 2018 or in 2019, Ms. Gambino threatened to report him to CPS for touching R inappropriately "if [he] did not pay a certain amount towards [R's] school fees." He testified that CPS called him in for an interview based on Ms. Gambino's allegations, but that after he paid the school fees as requested, Ms. Gambino "request[ed] CPS to drop" the case. According to T, on at least "a couple" of other occasions, Ms. Gambino threatened to report him to CPS or told him that he "would never see [his] child again" when he asked her for financial assistance to care for R.

After Ms. Gambino moved back in with him in January 2023, T explained, she would often leave the house during the day, and when he asked her to be more present to help him take care of R, she "would be very hostile" and would yell and argue with him in front of R. He stated that sometimes during these arguments, Ms. Gambino would yell at

3

R as well or would "break a couple of [his] items." T felt that the environment created by these arguments was not good for R, and it was because of this, and Ms. Gambino's refusal to help pay household expenses, that he asked her to move out in early March 2023.

According to T, Ms. Gambino moved out two to three weeks later after an argument during which she once again accused him of sexually abusing R. He recorded the argument on his phone and the State admitted the recording into evidence. In the recording, Ms. Gambino accused T of touching R inappropriately as R cried and called out several times for "Daddy." T asked R repeatedly to come to him as R responded that she couldn't, and Ms. Gambino told T to "[l]eave [R] alone." T told Ms. Gambino "[y]ou're not leaving" and that he was going to call the police before the video ended. T stated that after this argument, Ms. Gambino left the house with R. Later, she sent him text messages accusing him of molesting R "for 4 years" and threatening that he would "never see [R] again." The State admitted these messages into evidence.

T testified that he filed for custody of R the following Monday. Two days later, on March 29, 2023, Ms. Gambino filed for a protective order against T on R's behalf; the State admitted this petition into evidence along with the temporary protective order issued by the District Court of Maryland in Montgomery County on April 5, 2023. T explained that after the court denied Ms. Gambino's petition for a final protective order on April 12, 2023 and he was able to see R again, he and Ms. Gambino went back to the split custody arrangement they had followed since December 2018. Everything "was going ok," he said, until CPS and the Montgomery County Police Department ("MCPD") contacted him and asked him to participate in interviews relating to further allegations of sexual abuse. T

4

participated in "about three" such interviews in 2023.

Finally, T spoke about an argument that occurred the weekend before R's *third* forensic interview on May 10, 2023. T testified that on May 6, he took R to the fair and then brought her home with him. That night, he said, Ms. Gambino came to his house "a little intoxicated" and started yelling and arguing with him. He didn't remember what precipitated the argument but recalled that Ms. Gambino once again accused him of abusing R. As with the argument from late March, T recorded this argument on his phone. The State played the video without audio as T described for the jury what took place. He explained that R was "very upset" and "scared" throughout the encounter, was "screaming for [him] and crying to [him] to help her," and kept "try[ing] to run to the other room to stay away" from Ms. Gambino as Ms. Gambino yelled at her and "tr[ied] to grab her" and take her from the house. T testified that Ms. Gambino left the home when he threatened to call the police. At the close of his testimony, T denied having ever abused R in any way.

CPS social worker Camila Rodriguez testified that she asked Ms. Gambino to bring then five-year-old R in for her *first* forensic interview at the Tree House Child Advocacy Center ("Tree House") on April 4, 2023, after CPS asked her to prepare a report for the April 12 final protective order hearing. Ms. Rodriguez said that "almost immediately" after she brought R into the room, R "blurted out that her father touches her vagina and puts his penis in her mouth." When Ms. Rodriguez then attempted to explore with R "the peripheral details surrounding" her disclosure, such as when, where, and how these things had occurred, R was unable to provide many details beyond her initial statement. According to Ms. Rodriguez, R told her that these things happened when she was a baby or one year old,

5

and did not disclose more recent abuse.

Once Ms. Rodriguez concluded her interview with R, she and MCPD Detective Glenn Altshuler interviewed Ms. Gambino. Ms. Rodriguez stated that during this conversation, she expressed to Ms. Gambino that she was concerned about R's ability to remember events that occurred when she was one and about R's inability to recall any peripheral details about those events. The State admitted a recording of Ms. Rodriguez's interviews with R and Ms. Gambino into evidence. Sometime after the April 4 interviews, Ms. Rodriguez asked for and received R's medical records from Ms. Gambino. She testified that on April 7, she received texts and a voicemail from Ms. Gambino indicating that R was repeating her previous disclosures and making additional disclosures of abuse by T. The State offered a copy of the text messages into evidence.

Because of the new disclosures described by Ms. Gambino and a report from one of R's teachers, CPS invited Ms. Gambino to bring R in for a *second* forensic interview on April 27, 2023. Although Ms. Rodriguez didn't conduct the April 27 interview, she observed it via closed-circuit live feed. After the interview, Ms. Rodriguez and her supervisor reiterated to Ms. Gambino their concerns about R's ability to recall events from when she was one year old and her inability to explain peripheral details. They informed Ms. Gambino that R had repeated her previous disclosures but had not made any new disclosures about more recent abuse. Upon hearing this, Ms. Rodriguez explained, Ms. Gambino became "really upset" and began to question Ms. Rodriguez's qualifications and to assert R's ability to recall events that occurred when she was one.

The discussion with Ms. Gambino ended with Ms. Rodriguez and her supervisor

6

instructing her "not to have conversations with her daughter about these allegations," which Ms. Gambino told them she had been doing to "investigate" R's disclosures. Ms. Rodriguez testified that she made a similar cautionary statement to Ms. Gambino during their first phone call, before the April 4 interview. CPS closed its investigation into R's case that same day and Ms. Rodriguez stated that she had no further contact with R or Ms. Gambino.

Cathy Gonzalez, the social worker who conducted R's April 27 interview, testified that R disclosed to her during the interview "that when she was a baby, her dad rubbed her vagina and put his finger in her butthole." However, she confirmed that R once again had "difficulty giving contextual details about where she was, exactly when it happened, how it happened." She said that R also mentioned that her mother spoke to her about the case before she came in for the interview. The State admitted a recording of the April 27 interview into evidence.

Ms. Gonzalez also conducted R's *third and final* forensic interview on May 10, 2023. At the May 10 interview, Ms. Gonzalez explained, R "essentially, made the same allegations that when she was a baby, her dad sexually abused her." R did not allege that any abuse had occurred the prior weekend while she was staying with her father. Toward the end of the interview, R told Ms. Gonzalez that she "only [knew] a little bit" and that her mother had told her to tell Ms. Gonzalez "what [she (R)] told the police and the nurses." Ms. Gonzalez testified that she then left the room to consult with the members of her team who were viewing the interview from another room, because she was concerned that R "was being told what to say." The State admitted a video of the May 10 forensic interview into evidence.

Forensic nurse examiner Courtney Rangel, who conducted R's forensic medical examination at Shady Grove Medical Center ("Shady Grove"), testified as an expert in sexual assault forensic examination. Ms. Rangel confirmed that she examined R at around 8:00 PM on May 8, 2023. She testified that Ms. Gambino gave consent for her to examine R forensically and asked that she report the results of the examination to CPS and the police. Ms. Rangel explained that she had R undress, put her in a hospital gown, and checked her "from head to toe" for injuries. To examine R's vaginal area, Ms. Rangel said she had her lie down on her back, "gently grab[bed] . . . the labia . . . and . . . pull[ed] it towards [her]" to check for injury in R's vaginal and rectal area. Ms. Rangel testified that she did not notice any injuries aside from some redness in R's vaginal area. According to Ms. Rangel, this was not "anything of note" to her, as, typically, the condition she observed is "a hygiene thing" rather than evidence of abuse. Following the forensic examination, Ms. Rangel contacted CPS. The State offered a copy of Ms. Rangel's forensic medical exam report into evidence.

Social worker Raven Lee testified that CPS assigned her to a case involving R when the agency received a call from Shady Grove that R had come in for a forensic medical examination. She said that she asked Ms. Gambino to bring R in for the May 10 forensic interview and confirmed that during that interview R did not disclose that any abuse had occurred the weekend before, when she had stayed with her father. Ms. Lee stated that she and Detective Altshuler spoke to Ms. Gambino after Ms. Gonzalez interviewed R.

At that time, according to Ms. Lee, CPS had opened a neglect case against Ms. Gambino "as a result of her daughter having multiple forensic interviews, and potentially

8

an unnecessary [forensic] exam." Ms. Lee and Detective Altshuler spoke to Ms. Gambino "about how detrimental that could be to [R]." Because of the "high conflict between the parents," R's exposure to three forensic interviews and a forensic medical examination, and Ms. Gambino's questioning of R about the abuse allegations, Ms. Lee recommended that R "participate in therapeutic services." Ms. Lee testified further that after she informed Ms. Gambino that R did not make a new disclosure of abuse during her interview, Ms. Gambino "stated that she had recorded her daughter . . . . [m]aking a disclosure" and showed the recordings to her and Detective Altshuler upon request. Ms. Lee did not recall Ms. Gambino showing any videos of R saying that no abuse had occurred over the previous weekend.

At the end of her testimony, Ms. Lee, who has experience working on CINA cases, described a CINA as a child who is removed from their parents by the Department of Child Welfare Services. She explained that when CPS evaluates whether a child is a CINA, it considers "the child's risk and safety factors and if things can be alleviated via a safety plan." Finally, Ms. Lee testified that CPS never established a safety plan for R and that R was not a CINA at the time she was assigned to the case but that in her opinion, "if things continued" and "depending on how [R's] mental health was," Ms. Gambino continuing to talk to R about the sexual abuse allegations against T could have rendered R a CINA potentially.

Detective Altshuler testified that MCPD assigned him to investigate the sexual abuse allegations against T in March 2023. Detective Altshuler explained that while the social worker assigned to the case was tasked with assessing R's welfare, his role was to

9

"determin[e] if there had been a crime that had occurred." He stated that after R's April 4 forensic interview, he spoke to Ms. Gambino, reviewed R's medical records, interviewed T, wrote a report on his findings up to that point, and forwarded a copy of his report and the evidence he had gathered to the State's Attorney's Office. On the morning of April 27, Ms. Rodriguez notified him that R would be coming in for another forensic interview that day. Although he was not present for that interview, he was able to review the video recording and forwarded it to the State's Attorney's Office. At that time, the State's Attorney's Office determined that there was insufficient evidence of criminal activity to prosecute T for sexual abuse. Detective Altshuler testified that on May 3, 2023, he "called both [T] and Ms. Gambino and left them messages notifying them of the outcome and that [his] case was closed and there was not going to be any further action."

On May 9, MCPD assigned Detective Altshuler to a new investigation involving T, which MCPD initiated in response to new allegations that T had sexually abused R the previous weekend. Detective Altshuler stated that he was at Tree House on May 10 and confirmed that R did not make any new disclosures at her interview that day. He determined that there was no need for further investigation into T, and he and Ms. Lee told Ms. Gambino this when they spoke to her after R's interview. He, like Ms. Lee, testified that upon hearing that R hadn't made any new disclosures, Ms. Gambino mentioned and then played for them three videos she had recorded of R making disclosures in response to her questioning about "what [T] had done to her." The State admitted these videos into evidence over Ms. Gambino's objections.

Throughout these videos—taken between 6:02 PM and 6:26 PM on May 8, before

10

R's forensic medical examination later that evening—as Ms. Gambino continued to question R about whether her father sexually abused her over the weekend, R became increasingly frustrated and shouted at Ms. Gambino multiple times that she was embarrassed. In the *first* video, R said that T was "sweating all over [her]." Ms. Gambino asked her, "He was sweating on you? He was on top of you? What was he doing?" R replied that "He was—I don't know." In the *second* video, R told Ms. Gambino, "I think you need to take me to the doctor. My throat hurts." Ms. Gambino asked R what she was going to tell the doctor when they asked what happened, and R said "I'll tell you when we get to the doctor." After Ms. Gambino asked R several more times to tell her what she was going to say to the doctor, R finally said, "So my dad touches me down there, and—" before the recording cut off. In the *third* video, after asking Ms. Gambino why she was recording, and after Ms. Gambino asked her again if her father touched her over the weekend, R disclosed that T "touched [her] on the private part . . . ."

Detective Altshuler stated that at this time, Ms. Gambino didn't show him or Ms. Lee any videos in which R said nothing had happened over the weekend or in which she explained to R why CPS wasn't going to move forward with her case. He confirmed that after Ms. Gambino played the three videos, he determined that he would need to reopen the investigation into T to decide if the abuse allegations made in the videos had any merit. So at that point, he seized Ms. Gambino's phone and later obtained a warrant to search it. Upon reviewing the files extracted during the search, Detective Altshuler stated that he saw several videos taken before (but on the same day as) the videos Ms. Gambino had shown him and Ms. Lee. Detective Altshuler ended his testimony by explaining that it was "[t]he

11

production of the videos and the additional videos and messages that were recovered from [Ms. Gambino's] cell phone" that led to the investigation into Ms. Gambino for making a false statement to a law enforcement officer.

Detective Sergeant Jeremy Wojdan, a forensic investigator with the MCPD's Electronic Crimes Unit ("ECU"), testified as an expert in mobile device extraction. He explained that he searched Ms. Gambino's cellphone and described the forensic process he used to extract data from the phone. Detective Sergeant Wojdan confirmed that he had extracted all the videos shown to the jury at trial from Ms. Gambino's cellphone. He was able to identify each video by its unique file name and by images from each video provided in the forensic examination report. The State admitted a copy of the forensic examination report into evidence.

Finally, Ms. Gambino testified in her own defense. On direct examination, she recounted the history of her relationship with T and of R's medical issues involving redness and irritation in her genital area. Ms. Gambino testified this redness and irritation would occur after R "was in [T's] care" and stated that when she questioned T about R's condition, he became "highly defensive." According to Ms. Gambino, R started making disclosures of sexual abuse by her father in 2019 and she recorded these disclosures to document them. Ms. Gambino denied making any report to CPS, or ever threatening to do so for any reason, before 2023. She maintained that she made her 2023 reports to CPS, filed for a protective order against T, and brought R in for three forensic interviews and a forensic medical examination based on a good-faith belief that T was sexually abusing R.

Ms. Gambino also testified that she moved back out of T's home on March 24, 2023,

after one of R's teachers called to tell her that R was complaining of pain in her vaginal area. She said that when she asked R about the call, R told her that T had "been rubbing her vagina." She took R to her sister's apartment that day and called the police the following afternoon to report R's disclosure. During cross-examination, the State played footage from the body-worn camera of one of the officers who responded to Ms. Gambino's call. In the footage—and after R insisted that her father only touches her with a washcloth while he is bathing her—Ms. Gambino told R to "be honest" and to tell the officer what she told Ms. Gambino the night before about her father touching her inappropriately in the shower since she was one. R told Ms. Gambino she didn't remember saying this.

On cross, Ms. Gambino confirmed that at some point before R's April 27 forensic interview, CPS told her not to ask R questions about the case. Ms. Gambino confirmed that Detective Altshuler left her a voicemail on May 3, 2023 saying that the State was closing its investigation into T because of insufficient evidence. She testified that on May 8, the Monday after R spent the weekend with T, she picked R up from daycare and took her to a dance recital. When R's dance teacher brought to her attention that R "was very distractable," "wasn't following directions," and "was acting up" at the recital, she took R to the car and began to ask her what was wrong and to record her responses.

The State introduced into evidence and played two videos that Ms. Gambino recorded before she took the three videos she showed Ms. Lee and Detective Altshuler on May 10. In the *first* video, taken at about 4:22 PM, Ms. Gambino asked R, "Was your dad nice to you this weekend?" R responded, "Yeah, he didn't touch me." The *second* video,

taken at 5:55 PM, began with Ms. Gambino telling R she needed to tell her the truth about what happened over the weekend. R told her that her father washed her, but he "didn't touch [her] private part," and that he only "wiped [her] butt" and "didn't rub [her] vagina." Ms. Gambino then told R that the last time R spoke to the social worker, the social worker said that she couldn't use what R told her "as evidence" because she told the social worker that the events she described happened when she was one. She told R that if the police were going to protect her, the social worker needed her "to remember what [her] daddy did when [she was] five, or when [she was] four, or when [she was] three."

Ms. Gambino stated that she did not show these two videos to Ms. Lee and Detective Altshuler because R's statements in those videos weren't "concerning." She admitted that after R "immediately said" that her father "didn't touch [her]" over the weekend, she continued to question and film R on and off over the course of two hours, from 4:22 PM to 6:26 PM.

On January 23, 2024, the jury found Ms. Gambino guilty of making a false statement to law enforcement and contributing to a condition rendering a CINA. On March 27, 2024, a judge sentenced her to three years of imprisonment, suspended all but one year, and imposed five years of probation upon release for the CINA conviction and six months imprisonment for the false statement conviction, to run concurrently with the sentence for the CINA conviction. She filed a timely notice of appeal.

## II.     DISCUSSION

Ms. Gambino presents six questions for review, which we consolidate and rephrase:

1. Was the evidence sufficient to support Ms. Gambino's convictions for

14

making a false statement to law enforcement and contributing to a condition rendering a CINA?

2. Did the circuit court err in denying her motion to suppress the evidence obtained from her cellphone?

3. Did the circuit court abuse its discretion when it allowed Detective Altshuler to testify about his reasons for closing his investigation into T?

4. Did the circuit court violate Maryland's Wiretap Act when it admitted a recording of an argument between T and Ms. Gambino into evidence?

5. Did the circuit court abuse its discretion when it denied her motion for a new trial based on new evidence that Ms. Rodriguez provided inaccurate information in other, unrelated CPS investigations and when it quashed her subpoena to CPS?[1]

We hold *first* that the State presented sufficient evidence at trial to support both of

---

[1] Ms. Gambino phrases her Questions Presented as follows:

1. Did the trial court err in finding the evidence sufficient to convict Ms. Gambino of making a false statement to law enforcement?

2. Did the trial court err in denying Ms. Gambino's motion for acquittal of the CINA charge, given the State's failure to prove that [R] was a child in need of assistance and the court's failure to apply statutory immunity or allow evidence of Ms. Gambino's own history of sexual abuse?

3. Did the trial court err in denying Ms. Gambino's motion to suppress evidence obtained from her cell phone, where the initial seizure violated her constitutional rights, the delay in obtaining a search warrant was unreasonable, and evidence was admitted beyond the scope authorized by the warrant?

4. Did the trial court abuse its discretion by allowing Detective Altshuler to offer testimony that improperly vouched for the credibility of the allegations?

5. Did the trial court err in admitting video recordings that were in violation of Maryland's Wiretap Law?

6. Did the trial court abuse its discretion by denying Ms. Gambino's supplemental motion for a new trial based on newly discovered evidence that a key State witness, Camila Rodriguez, had engaged in misconduct, significantly undermining her credibility?

15

Ms. Gambino's convictions. *Second*, we find that the circuit court did not err when it denied Ms. Gambino's motion to suppress the evidence obtained from her cellphone. *Third*, we hold that the court did not abuse its discretion when it allowed Detective Altshuler to testify about his reasons for discontinuing his investigation into T. *Fourth*, we hold that the circuit court's admission of the recording of an argument between T and Ms. Gambino did not violate Maryland's Wiretap Act. *Fifth and finally*, we hold that the circuit court did not abuse its discretion when it denied Ms. Gambino's motion for a new trial based on evidence that Ms. Rodriguez provided inaccurate information in other, unrelated CPS investigations, or when it quashed her subpoena to CPS.

**A.    The Evidence Was Sufficient To Support Ms. Gambino's Convictions For Making A False Statement to Law Enforcement And Contributing To A Condition Rendering A CINA.**

Ms. Gambino's *first* claim of error on appeal is that the State presented insufficient evidence at trial to support either of her convictions. "The standard for appellate review of evidentiary sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 374 Md. 527, 533 (2003) (emphasis added). The Court defers to, and does not "second-guess," the jury's choice to credit one rational inference over another. *Smith v. State*, 415 Md. 174, 183 (2010). Likewise, we give deference to the jury's "finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *McDonald v. State*, 347 Md. 452, 474 (1997). Our role is not to "re-weigh" the evidence: we decide whether the evidence presented at trial was sufficient to support the guilty verdict. *Smith*,

16

374 Md. at 534. This standard applies to "all criminal cases, including those resting . . . in whole or in part on circumstantial evidence." *Id.* Under this standard, we hold that the State presented evidence at trial from which a rational juror could find beyond a reasonable doubt that Ms. Gambino both made a false statement to law enforcement and contributed to a condition rendering a CINA.

### 1. *Making a false statement to law enforcement*

Ms. Gambino contends *first* that the evidence was insufficient to support her conviction for making a false statement to law enforcement under Md. Code (2002, 2021 Repl. Vol.), § 9-501 of the Criminal Law Article ("CR"). This statute prohibits any person from making a statement "to a law enforcement officer of the State . . . with intent to deceive and to cause an investigation or other action to be taken as a result . . . ." CR § 9-501(a). The State charged Ms. Gambino under CR § 9-501 on the grounds that at her May 10 meeting with Ms. Lee and Detective Altshuler, she showed Detective Altshuler what she claimed was video evidence of R making new disclosures of abuse with the intent to deceive him and cause him to reopen his investigation into T. Ms. Gambino argues that the evidence was insufficient to convict her of this charge because she made the offending statement to Ms. Lee, a social worker, and not to Detective Altshuler, a law enforcement officer.[2] In response, the State argues that the jury "was not required to credit" Ms.

---

[2] Ms. Gambino also argues on appeal that the evidence was insufficient for any rational trier of fact to find that she had the requisite intent to deceive law enforcement and cause an investigation when she made the offending statement. Because she didn't make this argument at trial when she moved for judgment of acquittal, though, the

Continued . . .

17

Gambino's testimony that she intended to show the videos only to Ms. Lee. The State further argues that although Detective Altshuler "may not have spoken" up to the point in the meeting when Ms. Gambino produced the videos, he was "present in the room." We find that the State put forward evidence sufficient for a rational jury to conclude that Ms. Gambino showed the offending videos to Detective Altshuler and, consequently, to convict her under CR § 9-501.

Ms. Lee, Detective Altshuler, and Ms. Gambino each testified that Detective Altshuler, who was investigating R's case jointly with Ms. Lee, was present in the room at the May 10 meeting when Ms. Gambino played the videos. The meeting transcript, which was also in evidence, confirms his presence. As revealed in the transcript, Detective Altshuler introduced himself to Ms. Gambino at the start of the meeting as "Officer Altshuler" and reminded her that they had spoken previously about R's case. It's true, as Detective Altshuler testified, that Ms. Lee "le[d] the discussion" and that Ms. Gambino showed the videos in response to a question asked by Ms. Lee. Ms. Gambino testified also that she "showed [the videos] to [Ms.] Lee" and that Detective Altshuler was in the room only "as an observer." But even if Detective Altshuler was acting only as an "observer," that didn't negate his presence at the meeting or Ms. Gambino's awareness of his presence when she played the videos. To the contrary, the transcript reveals that the question Ms.

---

argument is waived. *See* Md. Rule 4-324(a) ("The defendant shall state with particularity *all reasons* why the motion [for judgment of acquittal] should be granted." (emphasis added)); *Hobby v. State*, 436 Md. 526, 540 (2014) ("The issue of sufficiency of the evidence is not preserved when the defendant's motion for judgment of acquittal is on a ground different than that set forth on appeal." (cleaned up)).

Lee asked just before Ms. Gambino pulled out her phone and pressed play was, "Do you mind showing *us*?" (emphasis added).

The jury was in the best position to decide how much weight to give Ms. Gambino's testimony about her intent when presenting the videos at the interview in light of all the other relevant evidence, and we will not disturb that decision. *See Smith*, 374 Md. at 533–34. Based on the evidence, a rational finder of fact could have found beyond a reasonable doubt that Ms. Gambino showed the videos to Detective Altshuler, a law enforcement officer. The evidence was sufficient to support Ms. Gambino's conviction for making a false statement to law enforcement under CR § 9-501.

### 2.     *Contributing to a condition rendering a CINA*

*Second*, Ms. Gambino argues that the State put forward insufficient evidence to sustain her conviction for contributing to a condition rendering a CINA under Md. Code (1974, 2020 Repl. Vol.), § 3-828 of the Courts & Judicial Proceedings Article ("CJ"). The statute provides that "[a]n adult may not willfully contribute to, encourage, cause or tend to cause any act, omission, or condition that renders a child in need of assistance." CJ § 3-828(a). A "CINA" is "a child who requires court intervention because" (1) they have been abused, neglected, or have a developmental disability or mental disorder; and (2) "[t]he child's parents . . . are unable or unwilling to give proper care and attention to the child and the child's needs." CJ § 3-801(f). The statute defines "abuse," in relevant part, as "[p]hysical or mental injury of a child under circumstances that indicate that the child's health or welfare is harmed or is at substantial risk of being harmed by . . . a parent." CJ § 3-801(b)(2)(i). It defines "neglect" as "the leaving of a child unattended or other failure

19

to give proper care and attention to a child by any parent . . . under circumstances that indicate" that the child's welfare or mental or physical health has been harmed or "placed at substantial risk of harm." CJ § 3-801(t)(1) (2025 Cum. Supp.). Importantly, a person may be convicted under CJ § 3-828 "even if the child is not adjudicated a CINA." CJ § 3-828(b).

Ms. Gambino contends that the State failed to present sufficient evidence at trial to support its theory that she rendered R a CINA under CJ § 3-828 by subjecting R to multiple forensic interviews and a forensic medical examination.[3] She relies heavily on Ms. Lee's

---

[3] On appeal, Ms. Gambino makes two additional arguments that the evidence didn't support her CINA conviction: that the circuit court erred by (1) "failing to apply statutory immunity for good faith reporting" and (2) "excluding evidence of [Ms. Gambino's] prior sexual abuse crucial to establishing her good faith basis for reporting." Although Ms. Gambino raised the statutory immunity issue on a pretrial motion to dismiss and attempted to present evidence of her personal history of sexual abuse during her opening statement, she did not make either argument when she moved for judgment of acquittal. Thus, both are waived for purposes of her sufficiency argument. *See* Md. Rule 4-324(a); *Hobby*, 436 Md. at 540.

If we treat the denial of Ms. Gambino's motion to dismiss on the grounds of statutory immunity as a separate claim of error, the question of whether Ms. Gambino reported R's disclosures "in good faith" for purposes of immunity under CJ § 5-620 was a question of fact left properly to the jury, not a question of law to be decided by the court. *Cf. Rite Aid Corp. v. Hagley*, 374 Md. 665, 681 (2003) (noting that application of immunity requires a factual finding that the reporter acted "with an honest intention" and "not simply negligently"). The circuit court didn't err, then, in denying the motion to dismiss. And even if Ms. Gambino's personal experience with sexual abuse was relevant to whether she reported R's disclosures in good faith, we cannot say the trial court acted unreasonably, and thus abused its discretion, by excluding evidence of those experiences as unduly prejudicial. *See* Md. Rule 5-401 (defining "relevant evidence"); Md. Rule 5-403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."); *Portillo Funes v. State*, 469 Md. 438, 478 (2020) ("An appellate court reviews de novo a trial court's

Continued . . .

20

testimony that R was not a CINA when CPS assigned her to R's case and states that "no witness testified to any psychological or emotional harm to [R] resulting from the forensic interviews and examination." Because of this, Ms. Gambino asserts, any evidence presented to support the State's argument that Ms. Gambino contributed to a condition rendering R a CINA was merely "speculative" and was insufficient to sustain her conviction.

The State responds that the jury "had ample evidence before it" from which it could conclude that Ms. Gambino contributed to a condition rendering R a CINA by coaching her into making false allegations of sexual abuse against her father and by subjecting her to unwarranted forensic interviews and an unnecessary forensic medical examination. To support its position, the State relies heavily on the testimony of Ms. Lee, the same witness on whom Ms. Gambino relies. The State points to Ms. Lee's statements that CPS recommended "therapeutic services" for R "[b]ased on the high conflict between the parents and the potential for [the allegations against T] to have been false," and that if Ms. Gambino had continued to talk to R about the case against CPS's advice, she could have potentially rendered R a CINA. Thus, the State concludes, the jury's verdict was reasonable because although no CINA proceedings had been initiated before Ms. Gambino's trial, her "actions were making it impossible for either of R[]'s parents to take care of her, without court intervention."

---

determination as to whether evidence is relevant. On the other hand, a ruling on the [exclusion of relevant evidence on grounds of prejudice] . . . is reviewed for abuse of discretion." (citations omitted)).

We hold that the State offered plenty of evidence at trial from which a rational juror could conclude beyond a reasonable doubt that Ms. Gambino contributed to a condition rendering R a CINA. To begin, we hold that the evidence was sufficient to support a finding by the jury that Ms. Gambino's treatment of R amounted to "abuse" or "neglect" causing harm or a substantial risk of harm to R's mental health and welfare. *See* CJ§§ 3-801(b)(2), 3-801(f)(1), 3-801(t)(1) (2025 Cum. Supp.). At trial, the State presented evidence in the form of a video recording that as early as September 2019, when R was only one year old, Ms. Gambino started manipulating her into saying that her father had sexually abused her. This video showed Ms. Gambino asking one-year-old R repeatedly, "Who did this?" and "Who touched you?" as R refused repeatedly to answer and only said "Daddy" after Ms. Gambino promised her a cookie in exchange for a response.

The jury also heard testimony from T that around this time, Ms. Gambino threatened to report him "if [he] did not pay a certain amount towards [R's] school fees" and that on at least "a couple" of other occasions, she made similar threats when he asked her to contribute financially to R's care. He stated that although he and Ms. Gambino took R to see the pediatrician multiple times from 2019 to 2023 due to redness and irritation in her vaginal area, the doctors each time found "no ongoing issues" and attributed R's condition to the soap they used to bathe her, diaper rash, and other causes not related to abuse. R's medical records, which the State introduced into evidence, largely substantiate T's assertion.

T testified that after Ms. Gambino moved back in with him in January 2023, it was not uncommon for her to start arguments with him in front of R during which she would

22

break things and sometimes yell at R directly. These fights, according to T, created such a negative environment for R that they contributed to his decision to ask Ms. Gambino to move back out of his home. The State introduced videos of two such arguments between Ms. Gambino and T (one from March 2023, the day before Ms. Gambino moved out, and the other from May 2023, the weekend before Ms. Gambino took R for a forensic examination), both of which show R screaming, crying, and visibly distressed.

The State also played for the jury body cam footage from R's police interview on March 25, 2023. After R told the officer that her father does not touch her inappropriately, Ms. Gambino instructed R to "be honest" and to tell the officer what she told Ms. Gambino the night before about her father touching her in the shower since she was one. The jury heard testimony from Ms. Rodriguez that before R's *first* forensic interview on April 4, 2023, and after her *second* forensic interview on April 27, 2023, CPS cautioned Ms. Gambino not to talk to or question R about the case. Ms. Rodriguez also testified that she scheduled the April 27 interview after receiving a report from one of R's teachers and a voicemail and text messages from Ms. Gambino informing her that R was making new disclosures. The jury saw these text messages. Ms. Rodriguez testified that R did not make any new disclosures during the April 27 interview and that she and her supervisor informed Ms. Gambino of this after the interview. Detective Altshuler testified, and Ms. Gambino confirmed, that he left her a voicemail on May 3 explaining that he was closing his investigation into T due to insufficient evidence of criminal activity.

Ms. Gambino confirmed in her testimony that CPS warned her in April not to ask R questions about the case. The State then played the series of five videos that Ms.

Gambino recorded on May 8, 2023. In these videos, taken over the course of two hours, Ms. Gambino asked R over and over if her father touched her inappropriately over the weekend, despite R's immediate denial in the *first* video. In the *second* video, Ms. Gambino told R that she needed to tell the social worker "what [her] daddy did when [she was] five, or when [she was] four, or when [she was] three" because the social worker said she couldn't use what R told her about events that occurred when she was one "as evidence." In the final three videos, R became noticeably frustrated with the questioning and shouted at Ms. Gambino multiple times that she was embarrassed. In response to Ms. Gambino's inquiries, R said in the *third* video that T was "sweating all over [her]" and in the *fourth* video that "my dad touches me down there." She told Ms. Gambino she needed to go to the doctor because her throat hurt. Finally, in the *fifth* video, R made a disclosure of abuse that occurred the weekend before.

The jury heard Ms. Gambino testify that after she filmed these videos, she consented to and took R to Shady Grove for a forensic medical examination. Ms. Rangel, the nurse who examined R, testified that for this evaluation she had R undress fully and get into a hospital gown so she could check her "from head to toe" for injuries; the examination included R's genital area. She testified that she did not notice any injuries aside from some redness in R's vaginal area, which was likely "a hygiene thing." Ms. Rangel stated that she sent a report of her assessment to CPS at Ms. Gambino's request, and Ms. Lee testified that after receiving that report, she asked Ms. Gambino to bring R in for her third forensic interview on May 10. The jury heard testimony from Ms. Gonzalez that R again made no new disclosures at the May 10 interview and that she became concerned that R "was being

told what to say" when R told her at both the April 27 and May 10 interviews that Ms. Gambino had been talking to her about the case. The jury also heard testimony from Ms. Lee and Detective Altshuler that when Ms. Lee told Ms. Gambino that R didn't make a new disclosure, she showed them some of the videos she recorded on May 8. Ms. Gambino testified later that she didn't provide the two videos where R asserts that nothing happened over the weekend "[b]ecause that wasn't concerning."

Finally, the jury heard testimony from Ms. Lee that in early May 2023, CPS opened a neglect case against Ms. Gambino "as a result of her daughter having multiple forensic interviews, and potentially an unnecessary [forensic] exam." Ms. Lee testified that talking about the case in front of R and having her participate in multiple interviews and examinations could be "detrimental" to her and could cause her to make false disclosures. She said that she recommended to Ms. Gambino that R participate in therapeutic services because of her exposure to several forensic interviews and a forensic medical exam, Ms. Gambino's questioning of R about the alleged abuse, and the "high conflict between [R's] parents." The jury also had in evidence the transcript of Ms. Gambino's interview with Ms. Lee and Detective Altshuler on May 10, in which Ms. Lee told Ms. Gambino that, "At this point, [CPS is] concerned that if nothing has happened . . . she's going to start to believe she is sexually abused, which is just as damaging as being sexually abused."

Ms. Lee also acknowledged that at the time she was assigned to the case, CPS had not put an action plan in place or adjudicated R a CINA. But she stated as well that "if things continued" and "depending on how [R's] mental health was," Ms. Gambino could have rendered R a CINA by continuing to talk to and question her about the sexual abuse

25

allegations against T. Regardless, the jury did not need evidence that CPS had formally adjudicated R a CINA to convict her of rendering R a CINA. CJ § 3-828(b). Based on the entire body of evidence presented by the State, it was not unreasonable for the jury to find that Ms. Gambino coached R into making false allegations of sexual abuse[4] against her father as early as 2019, when R was only one; continued to talk to R about the allegations against the express instructions of CPS social workers; started arguments with T in front of R accusing him of sexual abuse; and subjected R to three unnecessary forensic interviews and an unwarranted forensic medical examination. Accordingly, it was not unreasonable for the jury to conclude that Ms. Gambino, a licensed social worker with knowledge of the system and awareness of the likely consequences of her actions, caused R to suffer abuse or neglect that endangered her mental health and welfare. *See* CJ §§ 3-801(b)(2), 3-801(f)(1), 3-801(t)(1) (2025 Cum. Supp.).

Nor was it unreasonable for the jury to conclude that Ms. Gambino's actions made it impossible either for her or T to care properly for or attend to R's needs. *See* CJ § 3-801(f)(2). In addition to his testimony about his fights with Ms. Gambino in front of R and about Ms. Gambino threatening during financial disagreements to report him to CPS

---

[4] Although we conclude that the evidence presented at Ms. Gambino's trial—which included actual recordings of her asking her child continuously if her father had abused her despite the child's immediate and repeated denials—was sufficient to warrant a jury finding that she coached her child into making false allegations of sexual abuse, we recognize that these cases are highly fact-specific and that this case may be an outlier. False allegations of child sexual abuse are comparatively rare, and we would not want the unusual circumstances of this case, and this prosecution, to deter victims, those to whom victims have confided, and mandatory reporters from coming forward in appropriate cases.

and that he "would never see [his] child again," T testified that Ms. Gambino did report him to CPS once in 2019 and that CPS called him in for an interview. However, T said, Ms. Gambino "request[ed] CPS to drop" the case after he agreed to pay R's school fees.

During T's testimony, the State played the video T recorded of his March 24, 2023 argument with Ms. Gambino. In that video, Ms. Gambino accused T of sexually abusing R as R was in the room with them, crying. The State also introduced text messages between T and Ms. Gambino from the evening of March 25, the following day, after Ms. Gambino and R spoke to police. In these messages, Ms. Gambino accused T of molesting R "for 4 years" and threatened that he would "never see [R] again."

T filed for full custody of R on March 27. He testified about the temporary protective order Ms. Gambino filed against him on March 29, which prevented him from seeing R until April 12, when the final protective order was denied. The court admitted Ms. Gambino's application for the temporary protective order (in which she also asked for full custody), the temporary protective order, and the order denying the final protective order into evidence. Between March and May of 2023, T estimated that he participated in "about three" interviews with CPS and MCPD related to the sexual abuse allegations against him. Lastly, T described the fight he had with Ms. Gambino on May 6, 2023 as the State played a silent video of the argument for the jury. He said that during this argument, which also took place in R's presence, Ms. Gambino again accused him of sexually abusing R.

T and Ms. Gambino did testify that from the time they separated in December 2018 until 2023, apart from the three months when they lived together in early 2023 and the two-week period when the temporary protective order was in place, they maintained equal

custody of R under the same arrangement. In her testimony, Ms. Gambino denied that she ever reported T to CPS, or threatened to do so for any reason, before 2023. Again, though, the jury was free to give this testimony the weight it thought it deserved in light of all of the evidence before it. *See Smith*, 415 Md. at 183. Considering this full body of evidence, and although T never expressed any unwillingness to care for R, it was reasonable for the jury to conclude that Ms. Gambino threatened to report T to CPS and prevent him from seeing R again; that she accused T of sexual abuse during arguments that took place in front of R; that she manipulated R into making reports that T had touched her inappropriately; and that she applied for a restraining order that deprived T of custody temporarily. It was also reasonable for the jury to find that Ms. Gambino's actions harmed T's relationship with R and made him unable to meet her needs properly. *See* CJ § 3-801(f)(2). Likewise, it was reasonable for the jury to find that Ms. Gambino's actions toward her daughter, as demonstrated by the evidence at trial, reflected either an unwillingness or an inability to give "proper care and attention" to R and R's needs. *See id.* We hold that the evidence was sufficient to support Ms. Gambino's conviction for contributing to a condition rendering R a CINA. CJ § 3-828(a).

**B.     The Circuit Court Did Not Err In Denying Ms. Gambino's Motion To Suppress The Evidence Obtained From Her Cellphone**

Ms. Gambino contends *next* that the circuit court erred when it denied her motion to suppress evidence, including videos and text messages, obtained by police through a search of her cell phone. On appeal, she makes three arguments that MCPD obtained this evidence in violation of her Fourth Amendment rights. *First*, she argues that Detective

Altshuler's warrantless seizure of her phone was unconstitutional because it was not justified by exigent circumstances. *Second*, she contends that the twenty-one-day delay between the initial seizure of her phone and the issuance and execution of the search warrant was unreasonable and thus, unconstitutional. *Third*, she asserts that MCPD exceeded the scope of the search warrant issued on May 31, which authorized the seizure of content with associated dates between March 10, 2023 and May 10, 2023 when officers seized a video created in September 2019.[5]

When reviewing the circuit court's denial of a motion to suppress, we consider only the evidence admitted at the suppression hearing. *Gorman v. State*, 168 Md. App. 412, 421 (2006) (*citing Faulkner v. State*, 156 Md. App. 615, 640 (2004). "We consider the evidence

---

[5] Ms. Gambino argues further that even if the 2019 video fell within the scope of the May 31 warrant, the court should have suppressed it because it was "outside the applicable statute of limitations" that required the State to initiate prosecution for a misdemeanor "within [one] year after the offense was committed." CJ § 5-106(a). We need not discuss this argument at length because the statute of limitations is not a rule of evidence and has no bearing on the admissibility of the September 2019 video. And to the extent Ms. Gambino argues that the 2019 video was not relevant to the State's case against her, we disagree. *See* Md. Rule 5-401; *Portillo Funes*, 469 Md. at 478. The State charged Ms. Gambino in 2023 with contributing to a condition rendering R a CINA for conduct between September 2019 and May 2023. The 2019 video of Ms. Gambino repeatedly asking one-year-old R whether her father had touched her inappropriately was relevant to the State's theory of the case in that it helped establish a pattern of behavior that spanned several years and culminated in a chargeable offense in 2023. *See Duncan v. State*, 282 Md. 385, 387 (1978) ("'Statutes of limitation normally begin to run when the crime is complete.'") (*quoting Pendergast v. United States*, 317 U.S. 412, 418 (1943)). And to the extent Ms. Gambino argues that the 2019 video was unduly prejudicial, she waived this objection by failing to raise it at trial. *See* Md. Rule 2-517(a) ("An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived.").

in the light most favorable to the prevailing party" (the State) and accept the factual findings of the suppression court "unless clearly erroneous . . . ." *Faulkner*, 156 Md. App. at 640. Even so, "[w]e make our own constitutional appraisal as to whether an action taken was proper, by reviewing the law and applying it to the facts of the case." *Id.* Applying this standard, we hold that the seizure and search of Ms. Gambino's cellphone in no way violated her rights under the Fourth Amendment and that the circuit court did not err when it denied her motion to suppress the fruits of that seizure and search.

### 1. Exigent circumstances justified the warrantless seizure of Ms. Gambino's cellphone.

Ms. Gambino argues *first* that Detective Altshuler's initial warrantless seizure of her cellphone was unconstitutional because it was not justified by exigent circumstances. She asserts that at the time of the seizure, Detective Altshuler was not aware of any facts that would cause him to believe reasonably that she would delete the videos she had shown him and Ms. Lee of R making alleged disclosures. Up until Detective Altshuler seized her cellphone, Ms. Gambino contends, she cooperated fully and expressed a willingness to send the videos to Detective Altshuler of her own volition. He seized the phone, she argues, based on "speculative" concerns of evidence destruction that "arose solely from [her] lawful revocation of consent . . . ." As such, she asserts that the State failed to meet its burden to prove the existence of exigent circumstances that justified the warrantless seizure. The State responds that the videos, which showed R making disclosures of sexual abuse by T, were "evidence of a crime" and that the "volatile" and easily destructible nature of that evidence created circumstances sufficiently exigent to justify Detective Altshuler in

seizing Ms. Gambino's phone without a warrant. We hold that exigent circumstances justified Detective Altshuler's warrantless seizure of Ms. Gambino's cell phone.

Detective Altshuler's testimony comprised the full body of evidence presented at the suppression hearing on the issue of the warrantless seizure. He described the events leading up to his seizure of Ms. Gambino's cellphone, including her initial offer and later revocation of consent, and explained that he seized the phone without waiting to obtain a warrant to prevent the videos from being altered:

> [COUNSEL FOR STATE]: So as a result of the statements, especially those relating to [T], what did you decide to do with the phone—about the phone?
>
> [DETECTIVE ALTSHULER]: I asked Ms. Gambino if I could see the phone, and she handed it to me. I then informed her that I would like to have the phone downloaded to recover those videos as evidence. She initially consented. I went to get her our consent paperwork and seizure receipt because I was taking the phone. When I then returned to the room, she advised me that she no longer wished to consent to the search and allow us to have the phone. At that time, I informed her that because the videos were evidence, I would be seizing the phone and obtaining a search warrant for it.
>
> [COUNSEL FOR STATE]: Okay. So then why did you seize the phone at that point in time and not immediately go apply for a seizure warrant to actually take the phone? What were you concerned about?
>
> * * *
>
> [DETECTIVE ALTSHULER]: I seized the phone, at that point, to prevent any alteration to the data and evidence on the phone. Mainly, the videos that had been displayed to us.

On cross-examination, Detective Altshuler confirmed that Ms. Gambino had asked if she could send the videos to him. He also confirmed that before withdrawing her consent, Ms. Gambino expressed concern about her private photos and videos being accessed and

31

about his inability to say definitively how long the phone would be in MCPD's possession.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Warrantless searches and seizures are presumptively unreasonable, and thus presumptively unconstitutional, unless they fall under a "'specifically established and well-delineated exception[]'" to the Fourth Amendment's warrant requirement. *Bellamy v. State*, 111 Md. App. 529, 534 (1996) (*quoting Katz v. United States*, 389 U.S. 347, 357 (1967)). And a warrantless seizure is permissible "[w]here law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime . . . if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Place*, 462 U.S. 696, 701 (1983).

Here, Detective Altshuler developed probable cause to believe that Ms. Gambino's phone contained evidence of a crime when she—of her own volition—showed him the videos of R making apparent disclosures that T had abused her sexually. In addition, the exigencies of the circumstances demanded that he seize the phone to prevent the deletion or alteration of that evidence before he could obtain a search warrant. "The meaning of exigent circumstances is that the police are confronted with an emergency—circumstances so imminent that they present an urgent and compelling need for police action." *Stackhouse v. State*, 298 Md. 203, 219–20 (1983). One principal category of cases under the exigent circumstances exception to the warrant requirement involves the "destruction or removal of evidence." *Id.* at 213. To justify a warrantless search or seizure based on the destruction

of evidence, "the surrounding circumstances must present a specific threat to known evidence." *Id.* The officers conducting the warrantless search or seizure "must reasonably believe that a strong likelihood exists that the removal or destruction of the evidence is imminent." *Id.* at 214. "The police action must be justified by an immediate and compelling need and not by an inference about a future possibility." *Id.* at 217.

The reasonableness of a warrantless search or seizure based on exigent circumstances depends on "the facts as they appeared to the officers at the time of" the search or seizure. *Wengert v. State*, 364 Md. 76, 86 (2001). Factors relevant to the reasonableness of a warrantless search or seizure based on exigent circumstances include "the gravity of the underlying offense, the risk of danger to police and the community, the ready destructibility of the evidence, and the reasonable belief that contraband is about to be removed," *Williams v. State*, 372 Md. 386, 403 (2002), as well as "the opportunity of the police to have obtained a warrant." *Dunnuck v. State*, 367 Md. 198, 205–06 (2001). The exigent circumstances exception is narrow, *Williams*, 372 Md. at 402, and the burden of proving exigent circumstances rests on the State. *Stackhouse*, 298 Md. at 217.

That burden was met here, and we can see this in contrasting cases. In *Stackhouse v. State*, 298 Md. 203 (1983), the Supreme Court of Maryland held that there were no exigent circumstances to justify the warrantless search of Mr. Stackhouse's home and the attendant seizure of a shotgun barrel found in the attic. *Id.* at 220–21. Officers reported to the home of Mr. Stackhouse after the victim of a break-in identified him as the perpetrator. *Id.* at 207. The officers took him into custody, allowed him to return home when they could not definitively confirm his identity, and then went back to his home after they made the

necessary confirmation. *Id.* When the officers returned to the home, Mr. Stackhouse's sister told them she was alone in the house and went back inside. *Id.* at 208. Armed with arrest warrants for an unrelated charge, the officers followed the sister inside, removed her from the house, and began searching for Mr. Stackhouse. *Id.* After locating Mr. Stackhouse in the attic and taking him out into the hallway, the officers went back into the attic, where they found a shotgun barrel buried in the insulation. *Id.*

Our Supreme Court held that the State had not met its burden to prove that the warrantless search of Mr. Stackhouse's home and seizure of the gun barrel were justified by exigent circumstances. *Stackhouse*, 298 Md. at 219–20. The State had not proven that Mr. Stackhouse's sister, who was outside at the time of the search, presented a risk of evidence destruction. *Id.* at 220–21. Additionally, the Court noted, the officers did not know that the gun was in the home when they entered and seemed to be motivated by "the belief that *some* evidence of the crime *might* be found where [Mr. Stackhouse] had been hiding." *Id.* at 221 (emphasis added). Because the State failed to demonstrate that the officers knew of an imminent threat to specific evidence when they entered the home, the Court held that the search and seizure were unconstitutional. *Id.*

Similarly, in *Dunnuck v. State*, 367 Md. 198 (2001), the Supreme Court held that exigent circumstances did not justify officers' warrantless entry into Ms. Dunnuck's home and seizure of marijuana plants. *Id.* at 218. Police received a tip from an anonymous caller who reported seeing marijuana plants through the window of Ms. Dunnuck's house. *Id.* at 209. Police reported to the home and observed "what they believed to be marijuana in a birdcage in a side window." *Id.* They knocked on the door, confirmed that no one was

34

home, and consulted their supervisor, who advised them to go get a search warrant. *Id.* at 209–10. Instead of leaving to apply for a warrant, the officers waited until Ms. Dunnuck came home before knocking again and identifying themselves as members of the Queen Anne's County Drug Task Force. *Id.* at 210–11. The officers then noticed the plants moving in the window, forcibly entered the house, and seized the plants after getting Ms. Dunnuck to sign a consent form. *Id.* at 211.

The Court found no basis in the record to conclude that the officers had a reasonable belief that the marijuana plants were in danger of imminent destruction when they arrived on the scene. *Dunnuck*, 367 Md. at 213. The record indicated that until Ms. Dunnuck returned home and the officers knocked on her door, she was unaware that the police knew of the marijuana plants and were investigating her home. *Id.* at 214. The Court found significant that although the officers "acknowledged that they had probable cause and that the courthouse was no more than 15 minutes away," the State offered no evidence "as to the time it would take to get a warrant." *Id.* And the State put forth no evidence of a specific threat that Ms. Dunnuck was about to destroy the plants. *Id.* at 214–15 (citation omitted). The Court concluded that "[u]nder these circumstances, where there [was] no knowledge on the part of [Ms. Dunnuck] of the police investigation, there simply [were] no exigent circumstances permitting the police to forego the obligation of obtaining a warrant." *Id.* at 218.

Conversely, in *Gorman v. State*, 168 Md. App. 412 (2006), this Court found the circumstances sufficiently exigent to justify a warrantless search of Mr. Gorman's apartment and subsequent seizure of weapons, drugs, and other evidence found on the

premises. *Id.* at 419, 431. An officer responded to a Baltimore City neighborhood to investigate a shooting and encountered Mr. Gorman, the victim, and Ms. Harmon, his girlfriend. *Id.* at 416. The officer escorted Ms. Harmon to the apartment she shared with Mr. Gorman and his brother so that she could put on shoes (the officer had found her in the street barefoot). *Id.* at 416–17. When they arrived at the apartment and knocked, after a "minute or two" Mr. Gorman's brother, Mr. Painter, answered the door and, according to the officer, appeared "very nervous." *Id.* at 417. Through the open door, the officer could smell "the odor of burnt marijuana emanating from the apartment." *Id.* He then asked Mr. Painter why he was nervous, and Mr. Painter responded that "he had two bags of weed." *Id.* at 418. Ms. Harmon entered the apartment, and the officer followed, arrested Mr. Painter, and had his partner secure Mr. Painter in the police cruiser. *Id.* The officer then returned to the apartment and saw a chair in an open closet, which he believed another person may have used to hide themselves. *Id.* at 419. Upon investigating the closet, he found a handgun. *Id.* Police later obtained a warrant to search the home and found additional firearms, cocaine, and other evidence. *Id.*

The Court held that exigent circumstances justified the officer's warrantless entry into Mr. Gorman's apartment. *Gorman*, 168 Md. App. at 431. The Court noted that when Mr. Painter opened the door, he became aware that a police officer was present and could smell the odor of marijuana emanating from the open apartment door. *Id.* at 429. These facts were sufficient to create in the officer a reasonable belief that evidence of marijuana would be destroyed in the time it would take for him to obtain a search warrant. *Id.* at 424–25, 429. Even if the officer had secured Mr. Painter, the Court found exigent circumstances

36

still would have existed because it was reasonable for him to believe that other persons—including Ms. Harmon, whom he had no basis for detaining—were present in the home and could destroy evidence. *Id.* at 429.

In this case, exigent circumstances justified Detective Altshuler's warrantless seizure of Ms. Gambino's cell phone. Unlike in *Stackhouse*, where officers weren't aware of the seized gun or any other specific evidence when they entered Mr. Stackhouse's home without a warrant, 298 Md. at 221, Detective Altshuler learned here that there was evidence of a crime on Ms. Gambino's phone when she showed him the videos of R making alleged disclosures. Upon viewing the videos, he determined that "[s]ome of them [were] indicative of sex abuse of a minor," a felony punishable by up to twenty-five years in prison, CR § 3-602(c), and an offense that posed a great danger to R's wellbeing if the allegations in the video were true. *See Williams*, 372 Md. at 403 (explaining that factors bearing on a finding of exigency include "the gravity of the underlying offense" and "the risk of danger to police and the community").

Detective Altshuler was aware, as well, of a specific threat that this known evidence could be destroyed imminently. *See Stackhouse*, 298 Md. at 213–14. Unlike in *Dunnuck*, where the Court found a lack of exigency based largely on Ms. Dunnuck's lack of awareness that the police had seen the marijuana in her window and were investigating her home, 367 Md. at 214, Ms. Gambino showed Detective Altshuler herself what she described as "statements of [R] making a disclosure." Instead, the circumstances Detective Altshuler faced more closely resemble *Gorman*, where the officer who entered Mr. Gorman's apartment without a warrant knew that the occupant, Mr. Painter, was aware of

his presence and the fact that he could smell burning marijuana through the open apartment door. 168 Md. App. at 429. Not only did Ms. Gambino know that Detective Altshuler was aware of the videos, but she also knew that he wanted to obtain those videos "as evidence" because he told her as much when he asked for her consent to seize the phone.

It's true that Detective Altshuler did not testify that he informed Ms. Gambino that she herself was the target of an investigation. And it also is true that Ms. Gambino offered to send the videos to him herself. The officer was not, however, required to take her at her word and could have believed reasonably that Ms. Gambino, whom he had no basis for detaining at the time, might suspect that he wanted the videos as evidence against her and would destroy them if he permitted her to leave with the phone. *Cf. Gorman*, 168 Md. App. at 429 (noting officer had reason to believe Ms. Harmon, who was unrestrained in the apartment, presented an imminent threat of evidence destruction). Finally, although the State in this case, as in *Dunnuck*, 367 Md. at 214, presented no evidence about the time it would have taken for Detective Altshuler to obtain a warrant, the gravity of the suspected offense, the risk of danger to R, the "volatile nature" and destructibility of the videos saved on the phone, and Ms. Gambino's awareness of his desire to obtain the videos for evidence provided a sufficient basis collectively for Detective Altshuler to conclude that the warrantless seizure of Ms. Gambino's cell phone was necessary to prevent the imminent destruction or alteration of evidence. *See Williams*, 372 Md. at 403 (explaining that additional factors bearing on a finding of exigency include "the ready destructibility of the evidence" and "the reasonable belief that contraband is about to be removed"); *cf. Sinclair v. State*, 214 Md. App. 309, 329–30 (2013) (citation omitted) (recognizing "'volatile

38

nature' of cellphone information"), *aff'd*, 444 Md. 16 (2015); *Riley v. California*, 573 U.S. 373, 388 (2014) (recognizing that seizure of a cellphone incident to a lawful arrest eliminates the "risk that the arrestee . . . will be able to delete incriminating data from the phone").

As a final matter, we address Ms. Gambino's assertion that Detective Altshuler's concerns about evidence destruction "arose solely from [her] lawful revocation of consent" to the seizure of her phone. In its ruling denying the motion to suppress, the circuit court seemed to imply that Detective Altshuler could have concluded reasonably, *based on Ms. Gambino's revocation of consent*, that he needed to seize her phone to prevent her from destroying the videos:

> THE COURT: This detective was dealing with serious allegations of child abuse. Wasn't quite sure, apparently from looking at this probable cause, where this case was going. And first, [Ms. Gambino] says here are these videos, and you can look at them. And he did[.] And if she said go ahead and take the phone and everything, fine, we wouldn't be having this argument.
>
> *But the very fact that she then rescinds her consent*, certainly has got to make a reasonable police officer, a little bit—make him a little concerned that these videos—which is apparently all he's got at this time to further his investigation—could be destroyed.

Like Ms. Gambino, we are troubled by the notion that the lawful revocation of consent previously given could justify a warrantless seizure based on exigent circumstances. *See Snow v. State*, 84 Md. App. 243, 261–62 (1990) ("That law enforcement personnel assume that a citizen exercising his or her constitutional right to reject a [seizure] indicates that he or she is guilty of some criminal activity is disturbing."). People have the

right under the Fourth Amendment not to consent to a search, for any reason or no reason at all. And were that the only rationale supporting the officer's decision to seize Ms. Gambino's phone, we would not hesitate to find that the circuit court should have suppressed the evidence obtained from it as the fruits of an unconstitutional seizure. But there was a lot more to that decision here, and the circumstances as a whole were sufficiently exigent to justify Detective Altshuler in seizing Ms. Gambino's phone without considering her revocation of consent. And putting her revocation of consent completely aside, we hold that the warrantless seizure was not unconstitutional and that the circuit court did not err in denying Ms. Gambino's motion to suppress.

2.      *The delay in obtaining a warrant to search Ms. Gambino's cellphone was not unreasonable under the circumstances.*

*Second*, Ms. Gambino contends that even if exigent circumstances justified Detective Altshuler's warrantless seizure of her cell phone initially, the "unreasonable delay" between the date of the seizure and the dates of the issuance and execution of the two search warrants obtained in this case rendered the seizure unconstitutional. Detective Altshuler seized Ms. Gambino's phone on May 10, 2023. At the suppression hearing, he testified that "within that week" he submitted the phone into MCPD's evidence tracking system, placed it in the "queue" for examination by the ECU, and began drafting a search warrant application. He testified that he is not certified in the forensic extraction of cellphone data personally and that one of the six to eight certified detectives with the ECU needed to conduct the extraction. Jeremy Wojdan, Detective Sergeant of the Special Victims Investigation Division and supervisor of Detective Altshuler's team in the child

abuse unit, is certified in forensic extraction and performs extractions for the ECU as a "decentralized secondary position." He is not assigned specifically to perform extractions for Detective Altshuler's unit.

On May 31, twenty-one days after Detective Altshuler seized Ms. Gambino's phone, the ECU notified him that the phone had reached the front of the queue and was ready for examination, and at that point he applied for a search warrant. On July 6, fifty-seven days after seizing the phone, Detective Altshuler applied for a second search warrant based, in part, on information uncovered in the first search. He testified that although the ECU extracted fully the phone's contents during the execution of the first warrant, he had to place the phone back in the queue for the ECU to reexamine the extracted data and identify files responsive to the second warrant. As the court recognized at the suppression hearing, after the magistrate issues a search warrant, officers must execute it and prepare an execution report within ten days.

Ms. Gambino argues that Detective Altshuler's delay in applying for the search warrants rendered the seizure of her phone unreasonable. She contends that the State failed to present any evidence at the suppression hearing that a strain on MCPD resources caused the delay. Instead, she asserts, the delay resulted from mere "bureaucratic procedure" that did not override her possessory interest in her phone, an interest that remained undiminished given her refusal to consent to the seizure. On the other side, the State stresses that it is standard procedure in Detective Altshuler's unit not to apply for a search warrant for a device until it reaches the front of the extraction queue because once the magistrate issues a warrant, officers only have ten days to execute it and return a report.

Accordingly, the State asserts, Detective Altshuler's delay in applying for the warrants in this case was neither "constitutionally significant" nor impermissible, and indeed was "necessary and reasonable" and "consistent with responsible policework in a busy jurisdiction." We agree with the State that, under the circumstances, the delay between Detective Altshuler's seizure of the phone on May 10 and his application for the May 31 and July 6 search warrants did not render the seizure unreasonable under the Fourth Amendment.

Both parties rely on *United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019), as persuasive authority to support their respective contentions. In *Pratt*, the United States Court of Appeals for the Fourth Circuit held that the thirty-one-day delay between the seizure of Mr. Pratt's cellphone and the FBI's application for a warrant to search the phone rendered the search unreasonable. *Id.* at 272–73. As an initial matter, the court recognized that "[a] seizure that is 'lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests.'" *Id.* at 271 (*quoting United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). The Fourth Circuit explained that to "determine if an extended seizure violates the Fourth Amendment," the court must "balance the government's interest in the seizure against the individual's possessory interest in the object seized." *Id.* In *Pratt*, the government's only asserted interest was in figuring out whether law enforcement in North Carolina or South Carolina should apply for a warrant to search Mr. Pratt's phone, given that he had committed crimes in both states. *Id.* at 272. The court found that this interest was not strong enough to justify the thirty-one-day seizure given Mr. Pratt's possessory interest in the

phone, which was undiminished because he "didn't consent to its seizure or voluntarily share the phone's contents." *Id.*

The Fourth Circuit distinguished the facts in *Pratt* from those in *United States v. Vallimont*, 378 Fed. App'x 972 (11th Cir. 2010). In *Vallimont*, the United States Court of Appeals for the Eleventh Circuit held that a forty-five-day delay between the seizure and search of Mr. Vallimont's computer was reasonable given the strength of the government's interest and Mr. Vallimont's diminished possessory interest in the computer. *Id.* at 975–76. The delay in *Vallimont* resulted from the investigator's "diversion to other cases" and the fact that law enforcement resources were "simply overwhelmed." *Id.* at 976 (citation omitted). Additionally, Mr. Vallimont diminished his privacy interest in the computer when he shared its contents with a third party. *Id.* at 975–76.

In this case, neither the initial delay between the May 10 seizure of Ms. Gambino's cellphone and the issuance of the May 31 search warrant, nor the additional delay before the issuance of the July 6 search warrant, rendered the seizure of Ms. Gambino's cellphone unreasonable in violation of the Fourth Amendment. *First*, the State put forward sufficient evidence at the suppression hearing that the government's interest was strong enough to justify the delay. Detective Altshuler testified at the hearing that "within [the] week" after he seized the phone, he placed it in the queue for examination by ECU. He further testified that he applied for a warrant to search the phone the same day ECU notified him that they were ready to examine it, and we credit the circuit court's finding that he waited until that day only because he and the ECU officers would only have ten days after the magistrate issued the warrant to search the phone and prepare a report on the results. When the first

43

search produced evidence causing him to believe a second search was necessary, Detective Altshuler needed to return the phone to the queue for ECU to reexamine the previously extracted data, and that caused the additional delay leading up to the July 6 warrant. Unlike in *Pratt*, where officers in two jurisdictions "failed to exercise diligence by spending a whole month debating where to get a warrant," 915 F.3d at 272, the evidence in this case supports the circuit court's finding that Detective Altshuler followed standard MCPD procedure diligently and obtained both search warrants as soon as practically feasible.

The facts of this case resemble *Vallimont* more closely. The forty-five-day delay between seizure and search was not unreasonable in that case because the investigator was "diver[ted] to other cases" and law enforcement resources were "simply overwhelmed." 378 Fed. App'x at 976. Detective Altshuler testified that only six to eight MCPD officers are certified in the forensic extraction of cellphone data and that he isn't one of those officers. Although his supervisor, Detective Sergeant Wojdan, is certified in forensic extraction, he is not assigned to perform extractions for MCPD's child abuse unit specifically and performs extractions for ECU in addition to his primary duties as Detective Sergeant of the Special Victims Unit and supervisor of Detective Altshuler's child abuse unit team. Detective Altshuler's testimony demonstrated sufficiently that the delay between his seizure of Ms. Gambino's phone and the issuance and execution of the two search warrants was a product of limited manpower rather than a lack of diligence, and therefore was justified adequately.

*Second*, Ms. Gambino's possessory interest in her cell phone didn't outweigh the government's interest in seizing it in this case. Ms. Gambino argues that, as in *Pratt*, her

possessory interest in her phone remained undiminished because she "didn't consent to its seizure . . . ." 915 F.3d at 272. That's true, but unlike in *Pratt*, she did "voluntarily share the phone's contents" with Detective Altshuler and Ms. Lee when she showed them the videos of R making alleged disclosures when she thought it would help her. *Id.* Although she didn't go so far as to give a third party full access to her phone, as Mr. Vallimont did with his computer, 378 Fed. App'x at 975–76, Ms. Gambino still diminished her privacy interest in the phone by revealing some of its contents to Detective Altshuler and Ms. Lee. Because on balance this diminished privacy interest didn't outweigh the government's justified interest in seizing the phone, the delay between the seizure and later searches of the phone was reasonable and did not render the seizure unconstitutional.

3. *Although seizure of the September 2019 video exceeded the scope of the May 31 warrant, police seized it in good faith.*

*Third and finally*, Ms. Gambino claims that even if the original seizure and delay in obtaining the search warrants were reasonable, the circuit court should have granted her motion to suppress the video she recorded in September 2019 while questioning one-year-old R about alleged abuse by T. She contends that the seizure of this video exceeded the scope of the May 31 search warrant, which authorized the seizure of content with associated dates between March 10, 2023 and May 10, 2023.

At the pretrial suppression hearing on January 16, 2023, Detective Altshuler testified that MCPD seized the September 2019 video under the July 6 search warrant, which authorized them to seize content with associated dates between September 1, 2019 and September 30, 2019. He stated that he was "not sure" if he "look[ed] at any information

45

that was outside the scope of the [May 31] search warrant" before applying for the July 6 warrant, and that he applied for the July 6 warrant based on allegations of abuse from R's 2019 medical records; a child support filing from 2020; and the May 8, 2023 videos that Ms. Gambino did not show during the May 10 interview, which he obtained from the execution of the May 31 search warrant. Based on Detective Altshuler's testimony, the trial court denied Ms. Gambino's motion to suppress as to all the evidence obtained from her cellphone, including the September 2019 video.

Later, at trial, Detective Sergeant Wojdan described the forensic extraction process and the steps he took to extract evidence from Ms. Gambino's phone. He explained that the officer performing a forensic extraction *first* used the Graykey software to extract and download every data file from a device, including photos, videos, and text messages. *Next*, the officer uploaded all the device's data files to a second program (such as Cellebrite or, in this case, Magnet Axiom), which allowed them to limit the information provided in the forensic examination report by entering the date range or other parameters specified in the warrant. According to Detective Sergeant Wojdan, the program "eliminated all this other stuff, and it will only give you the data within [the specified] date range." The program also provided detailed information on each photo or video, such as when and where it was taken, when it was last accessed or viewed, and whether it was taken on that device or a different device. After extracting the data from the phone and narrowing the extracted files to fit the scope of the warrant, the officer *then* sent the narrowed set of files to the investigator who applied for the warrant as a "portable case file" with a copy of the forensic examination report. The officer then could "tag" specific videos in the portable case file

for the investigator as "evidence" or "items of interest."

Detective Sergeant Wojdan confirmed in his testimony that he located a video during the extraction that was not created within the 2023 date range provided in the initial May 31 search warrant. The video was created on September 6, 2019 but had last been accessed or viewed on March 7, 2023. On cross-examination, he testified that the forensic examination report generated after the execution of the May 31 warrant identified the 2019 video. Detective Sergeant Wojdan could not recall whether it was he or Detective Altshuler who tagged the 2019 video for the report, but he denied that he pulled the 2019 video in violation of the warrant. He stated his belief that the Magnet Axiom program included the video in the narrowed set of files provided in the report because of its "last accessed" date.

After Detective Sergeant Wojdan testified, the trial court held a second suppression hearing on the narrow issue of whether to suppress the 2019 video. *See* Md. Rule 4-252(h)(2)(C) (noting that the circuit court may "on the motion of a defendant and in the exercise of its discretion, grant[] a supplemental [suppression] hearing or a hearing de novo"). The court determined that there wasn't "any malevolence on the part of the State or the police to get the 2019 [video], even though they weren't allowed to go back there, based on the fact that the extraction extracts everything and the software doesn't know dates or can't limit the dates." The court denied Ms. Gambino's renewed motion to suppress the 2019 video.

On appeal, the State denies Ms. Gambino's assertion that MCPD exceeded the scope

of the May 31 search warrant unconstitutionally by seizing a video from September 2019.[6]

Although the State concedes that police discovered the 2019 video while executing the May 31 warrant, the State argues that police made this discovery in good faith. The State refers us to Sergeant Detective Wojdan's testimony that the program he used to narrow the data files extracted from the phone likely included the 2019 video in the narrowed file set because of its "last accessed" date, March 7, 2023. In her reply, Ms. Gambino points out that the March 7 "last accessed" date still falls outside the May 31 search warrant's March 10 to May 10 window and asserts that the good faith exception doesn't apply because "[n]o properly trained detective could reasonably believe a search for content created between March 10 and May 10, 2023, allowed examination of content from 2019 (or March 7, 2023, if the Court credits the State's 'Last Access Date' theory)." We hold that although the seizure of the 2019 video fell outside the scope of the May 31 search warrant, the police seized the video in good faith.

There is no dispute that MCPD officers discovered the video from September 2019 while executing the May 31 search warrant. That warrant authorized the seizure of data

---

[6] In essence, Ms. Gambino's argument boils down to a claim that MCPD exceeded the scope of the May 31 warrant without a good faith justification. Although she asserts that the July 6 warrant was a mere pretext to justify the improper seizure of the 2019 video retroactively, she doesn't contend that Detective Altshuler's July 6 warrant application, which doesn't mention that video, contained a deficient showing of probable cause. Nor does she argue that Detective Altshuler made any false or inaccurate statements in his application for the July 6 warrant. We need not, then, consider the State's argument that Ms. Gambino failed to "attempt to generate a [pretrial] *Franks* hearing . . ." *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978) (providing an avenue for a criminal defendant to challenge a probable cause finding based on false or inaccurate statements included in a warrant application).

files with associated dates between March 10 and May 10, 2023. Even if we credit the State's theory that the forensic extraction and analysis software included the video in the narrowed set of files responsive to the warrant because of its March 7 "last accessed" date, Ms. Gambino is right that that date still falls outside of the May 31 warrant's March 10 to May 10 range. So whether we look at the September 2019 creation date or the March 7, 2023 "last accessed" date, we must conclude that MCPD seized the video outside the scope of the May 31 warrant. Absent some exception to the warrant requirement or exclusionary rule, a trial court generally must suppress evidence seized outside the scope of a warrant. *See Klingenstein v. State*, 330 Md. 402, 410 (1993) (recognizing "general rule" that when officers seize items that fall both within and outside of a warrant's scope, only the evidence that exceeds its scope "[is] to be suppressed"); *Eusebio v. State*, 245 Md. App. 1, 40 (2020) ("Even a search that exceeds the scope of a warrant may be reasonable if it is supported by probable cause and fits within one of the recognized exceptions to the general warrant rule.").

The State doesn't attempt to invoke any recognized exception to the warrant requirement to justify the seizure of the 2019 video. This issue turns, then, on whether the good faith exception to the exclusionary rule can save the seizure. The exclusionary rule is a judge-made rule designed to deter police misconduct by prohibiting the use of unconstitutionally obtained evidence in criminal proceedings. *United States v. Calandra*, 414 U.S. 338, 347–48 (1974). But courts long have recognized that excluding evidence unconstitutionally obtained by officers who believed honestly and in good faith that their actions were constitutional wouldn't advance the rule's purpose. *See Michigan v. Tucker*,

417 U.S. 433, 447 (1974) ("The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct . . . . Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."); *United States v. Peltier*, 422 U.S. 531, 542 (1975) ("If the purpose of the exclusionary rule is to deter unlawful police conduct then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge . . . that the search was unconstitutional . . . ."). The result is an exception to the exclusionary rule for searches and seizures where police took an objectively reasonable action, although later determined to be unconstitutional, "in good-faith reliance on a properly issued judicial warrant . . . ." 1 Byron L. Warnken et al., Warnken's Maryland Criminal Procedure 471–72 (G. Adam Ruther ed., 2d ed., 2022); *United States v. Leon*, 468 U.S. 897, 918–19 (1984) ("[E]ven assuming that the rule effectively deters some police misconduct . . . it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.").

In *Maryland v. Garrison*, 480 U.S. 79 (1987), the Supreme Court of the United States held that the good faith exception to the exclusionary rule applied when officers searched the wrong dwelling on the third floor of an apartment building because, based on the search warrant and their own observations, they believed reasonably that there was only one apartment on the third floor. *Id.* at 81, 88–89. The officers acted on a search warrant authorizing them to search a Mr. McWebb and his home, "the premises known as 2036 Park Avenue third floor apartment." *Id.* at 80. "There [was] no question that the warrant was valid and was supported by probable cause." *Id.* at 81. When officers arrived at 2036

Park Avenue to execute the warrant, Mr. McWebb opened the locked door to the first-floor hallway and another at the top of the stairway to the third floor for them, and they entered one of two open doors on that floor and began their search. *Id.* Only after they seized evidence from what turned out to be Mr. Garrison's apartment, not Mr. McWebb's, did the officers realize that there were two apartments on the third floor. *Id.* The Court held that because the officers acted based on a valid warrant and made a "reasonable effort to ascertain and identify the place intended to be searched" by investigating the building's exterior and inquiring with the utility company, "the objective facts available to [them]" supported application of the good faith exception. *Id.* at 81, 88.

We reach the same conclusion here. As Detective Sergeant Wojdan explained in his testimony, when an officer first extracts data from a cell phone using Graykey, they must extract all the phone's data, and there is no way for the officer to limit what data files the software extracts at this initial step. The officer then uses a second program to narrow the files provided in the extraction report, based on the parameters provided in the search warrant, before sending the report and "portable case file" to the investigator who requested the extraction. Detective Sergeant Wojdan followed these steps in this case, and he instructed the second program specifically to include in the report only those files with associated dates between March 10 and May 10, 2023, the date range specified in the May 31 warrant. After he entered these dates into the program, whether because of its "last accessed" date or otherwise, the program included a video in the forensic extraction report that fell outside the scope of the warrant.

Based on its finding that there wasn't "any malevolence on the part of the State or

the police" and its recognition that "the extraction extracts everything and the software doesn't know dates or can't limit the dates," the circuit court appeared to credit Detective Sergeant Wojdan's testimony that technical limitations rather than any intentional misconduct by Detective Sergeant Wojdan or Detective Altshuler caused the seizure of the 2019 video in violation of the May 31 warrant. We see no clear error in the circuit court's findings. *See Faulkner*, 156 Md. App. at 640 ("We accept the suppression court's first-level factual findings unless clearly erroneous, and give due regard to the court's opportunity to assess the credibility of witnesses."). And based on those findings, we hold that the officers who executed the May 31 search warrant acted in an objectively reasonable manner in good-faith reliance on a valid search warrant. *See* Warnken et al., *supra*, 471–72; *Leon*, 468 U.S. at 918–19.

As in *Garrison*, Ms. Gambino doesn't question that the May 31 warrant itself "was valid and was supported by probable cause." 480 U.S. at 81. Nor was any evidence presented at either suppression hearing that revealed how Detective Sergeant Wojdan knew or should have expected that the Magnet Axiom program would include a video outside the warrant's scope in the forensic examination report, mistakenly or otherwise. As the officers did in *Garrison*, *id.*, Detective Sergeant Wojdan made a "reasonable effort" here to comply with the warrant by instructing the program to return only those files with associated dates in the range the warrant specified. Once Detective Sergeant Wojdan and Detective Altshuler realized the program's mistake, Detective Altshuler applied for another search warrant with a timeframe covering the creation date of the September 2019 video and did not rely on that video's existence to establish probable cause in the second

application. Although the July 6 warrant didn't—and couldn't—cure the constitutional violation, it is further evidence that the officers, who could not reasonably be expected to ignore the 2019 video once they learned of its existence, behaved in an objectively reasonable manner under the circumstances. We hold that the conduct of Detective Sergeant Wojdan and Detective Altshuler in this case was not the type of willful, knowing, or even negligent misconduct that the exclusionary rule was designed to deter, *see Tucker*, 417 U.S. at 447; *Peltier*, 422 U.S. at 542; that the good faith exception to the exclusionary rule applies; and that the trial court did not err in denying Ms. Gambino's motion to suppress the September 2019 video.

### C. The Circuit Court Did Not Err In Allowing Detective Altshuler To Testify As To Why He Closed His Investigation Into T.

Ms. Gambino's *fourth* claim of error relates to testimony given by Detective Altshuler about his reasons for discontinuing his investigation into T in May 2023. At trial, the prosecution asked Detective Altshuler why he decided not to investigate T further after his conversation with Ms. Gambino on May 10. Detective Altshuler replied that he made this decision based on "evidence suggesting" that Ms. Gambino's report against T wasn't credible:

> [COUNSEL FOR STATE]: Now, you were asked, did you look at [T], speak to [T] again or do anything involving [T] after May 10th. Why not?
>
> [DETECTIVE ALTSHULER]: Because at that point, I, having served the search warrant on Ms. Gambino's phone, found evidence suggesting that she had fabricated the report and that—
>
> [COUNSEL FOR DEFENDANT]: Objection.
>
> [DETECTIVE ALTSHULER]: —there was not a valid report

against [T].

* * *

[COUNSEL FOR STATE]: What other evidence that was out there led you to that conclusion?

[DETECTIVE ALTSHULER]: The four videos preceding the three she had shown me.

[COUNSEL FOR STATE]: And was there any other evidence as to why you would decide to not interview [T] again?

[DETECTIVE ALTSHULER]: There are also messages on the phone between her and him, as well as Ms. Gambino and other associates of hers, that led me to believe that it was not a credible allegation against [T]. And for that reason, I had no further need to talk to him a second time.

Ms. Gambino argues that this testimony by Detective Altshuler was improper because it influenced the jury unduly and infringed on the jury's role, as factfinder, to assess witness credibility. She directs our attention to *Bohnert v. State*, 312 Md. 266 (1988). In *Bohnert*, the Supreme Court of Maryland held that opinion testimony given by an expert witness on behalf of the State was "inadmissible as a matter of law" and that its "receipt in evidence . . . constituted reversible error" because the testimony "invaded the province of the jury . . . ." *Id.* at 279. *Bohnert* involved allegations of sexual abuse that were not substantiated by physical evidence or by eyewitness testimony. *Id.* at 270. The case hinged on relative credibility: the testimony of the fourteen-year-old alleged victim or that of Mr. Bohnert, her alleged abuser. *Id.* at 273.

As its final witness, the prosecution called a social worker to testify as an "expert in the field of child sexual abuse." *Id.* at 271. The social worker, who based her conclusion on statements from the victim, the victim's mother, and other unidentified persons, stated that it was "[her] opinion . . . that [the victim] was, in fact, a victim of sexual abuse." *Id.* at

54

271. In closing argument, the Stated relied heavily on this testimony, asserting to the jury that it had an "unrefuted" expert opinion that the alleged victim was sexually abused. *Id.* at 273–74. The Court found that the expert's testimony was equivalent to an assertion that the alleged victim was telling the truth while Mr. Bohnert was lying. *Id.* at 278–79. The testimony was improper because it "encroached on the jury's function to judge the credibility of the witnesses and weigh their testimony and on the jury's function to resolve contested facts," and the circuit court's decision to receive the expert's opinion into evidence was "beyond the range of an exercise of discretion." *Id.* at 279; *see also Hunter v. State*, 397 Md. 580, 595 (2007) (prosecutor's questions to defendant about whether police were lying were "impermissible as a matter of law because they encroached on the province of the jury" by asking defendant to assess credibility of other witnesses).

Ms. Gambino argues here that Detective Altshuler's testimony, like the testimony of the expert in *Bohnert*, "unduly influenced the jury, leading them to accept his conclusions as expert findings, given his investigative experience, instead of assessing witness credibility on their own." The State counters by pointing to *Tyner v. State*, 417 Md. 611 (2011). *Tyner* arose from a Baltimore City altercation that ended in a fatal shooting. *Id.* at 612. After the shooting, the police identified the defendants' getaway driver, Ms. McCullough, who agreed to provide "her truthful testimony" against the defendants in exchange for the State's agreement to drop the murder charges against her. *Id.* at 613. At trial, Ms. McCullough testified that the defendants were the ones responsible for the shooting. *Id.* The detective with whom she first shared her story after entering into her agreement with the State also testified. *Id.* at 614. On the stand, the detective stated it was

his understanding that Ms. McCullough made her statement to him "to tell the truth" about what happened on the night of the shooting. *Id.* at 619. He agreed that, to his knowledge, this was "part of [Ms. McCullough's] agreement with the State." *Id.*

The Supreme Court of Maryland held that the detective's testimony "did not infringe upon the jury's fact-finding obligation." *Tyner*, 417 Md. at 621. The court explained that to resolve the question of whether the detective's testimony amounted to improper bolstering of another witness, it needed to consider "not only precisely what the focal testimony was at trial, but also the context in which it was used." *Id.* at 617. The detective testified at trial after Ms. McCullough took the stand and told a story that was consistent with the final statement she made to the detective but was inconsistent with statements she made prior to making her deal with the State. *Id.* at 617–18. In context, the Court found, the detective's testimony merely provided a possible explanation for the inconsistencies in Ms. McCullough's statements to police. *Id.* at 621. He "did not state that what another witness responded was accurate or truthful, only that the witness *had an obligation* . . . to state truthfully what occurred." *Id.* at 620–21. Moreover, the prosecution specifically reminded the jury at closing that it was "up to [them]" to decide whether Ms. McCullough actually told the truth about what happened the night of the shooting. *Id.* at 619. Because he "did not confirm . . . a lay-witness's first-hand allegations" or "opine . . . on other witnesses' credibility," the Court held, the detective's testimony was not improper bolstering and the circuit court hadn't erred by allowing it into evidence. *Id.* at 620–21.

The State contends that in this case, as in *Tyner*, Detective Altshuler was not opining

on the credibility of Ms. Gambino, another witness, but giving a factual explanation of his reasons for not continuing to investigate T after May 10, 2023. Finally, the State argues that, unlike in *Bohnert*, the prosecution in the present matter "never intimated to the jury that it should substitute Detective Altshuler's assessment for its own."

"Whether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant," *Mutyambizi v. State*, 33 Md. App. 55, 60 (1976), and one witness's assessment of another witness's credibility is inadmissible under Maryland Rule 5-402. *Tyner*, 417 Md. at 616. So we don't review the circuit court's decision to admit alleged "bolstering" testimony for abuse of discretion—we conduct an independent evaluation to determine whether the challenged testimony was "inadmissible as a matter of law." *See Bohnert*, 312 Md. at 276–77.

In this trial, Detective Altshuler's testimony didn't serve as an inadmissible assessment of the credibility of Ms. Gambino. As in *Tyner*, the context is critical. *See* 417 Md. at 617–18. Detective Altshuler gave the challenged testimony on redirect examination after defense counsel asked him a series of questions on cross that were meant to imply that he ceased his investigation because T had a family member employed by MCPD:

> [COUNSEL FOR DEFENDANT]: . . . When you met [T] previously, back in April, first time you—only time you interviewed him, correct?
>
> [DETECTIVE ALTSHULER]: Yes. I met with him in April, correct.
>
> [COUNSEL FOR DEFENDANT]: Did he mention to you right away that he had a close family member working in your office for 20 years in that interview?
>
> [DETECTIVE ALTSHULER]: I don't remember.

* * *

[COUNSEL FOR DEFENDANT]: Is this the transcript from that interview with [T]? Tell me if that refreshes your recollection, now, that he did tell you that?

[DETECTIVE ALTSHULER]: He mentioned an Ofc. Butler. I—I don't know an Ofc. Butler.

* * *

[COUNSEL FOR DEFENDANT]: Now, after that interview, how many more interviews did you have with [T]?

[DETECTIVE ALTSHULER]: That was the only time I interviewed [T].

[COUNSEL FOR DEFENDANT]: The only time you interviewed. What other detective work did you do on [T]? Did you talk to his neighbors?

[DETECTIVE ALTSHULER]: I did not talk to his neighbors.

[COUNSEL FOR DEFENDANT]: Did you search his phone?

[DETECTIVE ALTSHULER]: I did not search his phone.

* * *

[COUNSEL FOR DEFENDANT]: Would you agree, that's not much of an investigation?

[DETECTIVE ALTSHULER]: I'm sorry?

[COUNSEL FOR DEFENDANT]: Would you agree, that's not much of an investigation?

In context, Detective Altshuler made the challenged statement on redirect not to attack Ms. Gambino's credibility as a witness, but to rehabilitate his *own* credibility after the defense attempted to impeach him. The prosecutor didn't ask him, impermissibly, to opine on Ms. Gambino's credibility as a witness or ask him directly whether he thought Ms. Gambino—who testified a day later—was lying. *See Hunter*, 397 Md. at 595. Like the detective who gave the disputed testimony in *Tyner*, Detective Altshuler was asked to give a factual explanation of his reasons for not continuing to investigate T after May 10, 2023.

58

*See* 417 Md. at 621. Moreover, and unlike *Bohnert*, this was not a case that hinged solely on the jury's assessment of the credibility of two competing witnesses. *See* 312 Md. at 273. The State called seven witnesses in its case in chief, each of whom testified about their personal knowledge and understanding. The State also introduced several pieces of physical evidence including text messages, videos, and medical records. Detective Altshuler detailed to the jury the evidence on which he had relied on to conclude "that [Ms. Gambino] had fabricated the report" against T and "that it was not a credible allegation . . . ." The jury had this same evidence (which included texts between T and Ms. Gambino and the videos from May 8 that Ms. Gambino did not show at the May 10 interview) before it and was free to assess independently the merits of Detective Altshuler's conclusion that the reports against T were fabricated and lacked credibility.

To be sure, the testimony of the detective charged with investigating the allegations of abuse underlying this case could well hold significant weight in the minds of the jurors. But this was not a case where the prosecution indicated to the jury that Detective Altshuler's testimony was conclusive on the issue of the truth or falsity of Ms. Gambino's reports against T or that the jury should substitute Detective Altshuler's judgment for its own. *Compare Bohnert*, 312 Md. at 273–74. His testimony did not "encroach[] on the jury's function to judge the credibility of the witnesses and weigh their testimony" or "to resolve contested facts." *Id.* at 279. We hold that the circuit court did not err in allowing Detective Altshuler's testimony about why he stopped his investigation into T because the testimony was not "inadmissible as a matter of law." *Id.*

**D.      The Circuit Court Did Not Violate Maryland's Wiretap Act By Admitting A Recording Of A Fight Between T And Ms. Gambino.**

*Fifth*, Ms. Gambino asserts that the circuit court violated Maryland's Wiretap Act when it allowed into evidence an audiovisual recording of an argument between her and T because T recorded the video without her consent.[7] The State responds that the circuit court admitted the video properly because Ms. Gambino did not have a reasonable expectation of privacy in the recorded conversation. We hold that the circuit court did not violate the Wiretap Act when it admitted the video into evidence.

Under Maryland's Wiretap Act, "it is unlawful for any person to . . . [w]illfully intercept . . . any wire, oral, or electronic communication" or to willfully use or disclose any such unlawfully intercepted conversation. CJ § 10-402(a)(1)–(2). To "intercept" a communication is to record its audio contents using "any electronic, mechanical, or other device," *e.g.*, a cellphone CJ § 10-401(10). A party to a conversation may record it if "all of the parties to the communication have given prior consent . . . ." CJ § 10-402(c)(3). A

---

[7] At trial, the circuit court admitted two recordings of arguments between T and Ms. Gambino: Exhibit 10, which the State played with sound, and Exhibit 11, which the State played without sound. Any claim of error as to the admission of the soundless Exhibit 11 is not before us properly because Ms. Gambino stated on the record that she was "not objecting" to the admission of the video and objected only to the admission of the "oral communication being recorded." *See* Md. Rule 2-517(a) ("An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived."); Md. Rule 8-131(a) ("Ordinarily, an appellate court will not decide [an] issue unless it plainly appears by the record to have been raised in or decided by the trial court . . . ."). Moreover, the Wiretap Act "regulates only the interception of oral and wire communications" and does not apply to soundless video recordings. *Ricks v. State*, 312 Md. 11, 20, 24 (1988), *superseded by* Md. Rules 5-701 and 5-702, *as recognized in*, *Ragland v. State*, 385 Md. 706 (2005).

conversation recorded in violation of the Wiretap Act cannot be admitted as evidence at trial, CJ § 10-405(a), so we review the circuit court's decision to admit the challenged recording without deference "to determine whether the trial court was legally correct in its interpretation" of the statute. *Holmes v. State*, 236 Md. App. 636, 651 (2018).

In *State v. Maddox*, 69 Md. App. 296 (1986), this Court explained that the purpose of Maryland's Wiretap Act is to limit the interception of private conversations and "protect those who do not know their conversation is being electronically intercepted." *Id.* at 300–01. As the Supreme Court recognized in *Agnew v. State*, 461 Md. 672 (2018), "the protections afforded by the Wiretap Act offer shelter to those who do not consent to the interception of their private conversations, thereby maintaining a reasonable expectation of privacy in their conversations." *Id.* at 683. "[W]hen one party to a conversation expressly or implicitly consents to the recording of that conversation, the recording is admissible in evidence against the consenting party . . . ." *Maddox*, 69 Md. App. at 301. In *Holmes*, we noted that when a person is "aware" that someone is recording them via cellphone, "they fairly may be understood to tacitly consent to it." 236 Md. App. at 654.

The protections afforded by the Wiretap Act don't extend to T's cell phone recording of Ms. Gambino's argument with him on March 24, 2023. At trial, T demonstrated how he held his phone "in front of his face" while taking the video. He did not hide the phone or attempt to conceal the fact that he was recording. Ms. Gambino must have been aware that T was taping their conversation and thus had no reasonable expectation of privacy in that conversation. *See Agnew*, 461 Md. at 683. And if Ms. Gambino didn't want T to record her, she had the opportunity to ask him to stop, to leave

61

the room, or to otherwise end the argument to prevent him from doing so. Because she knew T was recording and didn't take any steps to prevent him from intercepting her words, Ms. Gambino "fairly may be understood to [have] tacitly consent[ed] to" the interception. *Holmes*, 236 Md. App. at 654. The circuit court did not violate the Wiretap Act when it admitted the recording into evidence.

> ### E. The Circuit Court Did Not Abuse Its Discretion When It Denied Ms. Gambino's Motion For A New Trial Based On New Evidence That Ms. Rodriguez Provided Inaccurate Information In Other CPS Investigations Or When It Quashed Her Subpoena to CPS.

Ms. Gambino's *sixth and final* argument on appeal is that the circuit court abused its discretion when it denied her motion for a new trial based on newly discovered evidence that Ms. Rodriguez, the first CPS social worker to contact Ms. Gambino about R's case and interview R, submitted inaccurate or falsified records in unrelated CPS investigations. Relatedly, she asserts that the circuit court abused its discretion further by quashing a subpoena served by Ms. Gambino on CPS seeking records related to Ms. Rodriguez's alleged misconduct. We hold that the circuit court did not abuse its discretion when it denied Ms. Gambino's motion for a new trial or when it quashed the subpoena to CPS.

> #### 1. The circuit court did not abuse its discretion when it denied Ms. Gambino's motion for a new trial.

Ms. Gambino argues *first* that the circuit court abused its discretion when it denied her motion for a new trial based on newly discovered evidence that Ms. Rodriguez provided false testimony and documentation in other CPS cases. On February 2, 2024, ten days after the jury issued its verdict on January 23, Ms. Gambino filed a motion for a new trial on grounds not pertinent to this appeal. About three weeks later, on February 22, the State

informed Ms. Gambino that on February 5, it had learned that Ms. Rodriguez "provided the State's Attorney's Office with inaccurate documentation" in an unrelated CPS investigation "conducted between November 2023 and January 202[4]."[8] The State explained that the inaccurate documentation "related to [Ms. Rodriguez's] completion of certain interviews and the date and time of the interviews" and that, because of Ms. Rodriguez's alleged misconduct, the State would not be sponsoring Ms. Rodriguez's testimony in any upcoming legal proceedings. On February 26, Ms. Gambino filed a supplement to her new trial motion, asserting that a new trial was warranted based on this "newly discovered evidence" furnished by the State. The circuit court denied her supplemental motion at her sentencing hearing on March 27, 2024.

Ms. Gambino contends that she was entitled to a new trial because the information provided by the State about Ms. Rodriguez "materially impacts the integrity" of the jury's guilty verdict. She asserts that without the testimony of Ms. Rodriguez, who participated in R's April 4 and April 27, 2023 forensic interviews, the State would have been unable to prove its case against her beyond a reasonable doubt. Because she was "denied the opportunity to impeach [the] credibility" of one of the State's key witnesses at trial with alleged newly discovered evidence of misconduct bearing on her professional judgment and reliability as a CPS investigator, Ms. Gambino concludes that a new trial is warranted and that denial of her motion for a new trial was an abuse of discretion.

---

[8] At Ms. Gambino's sentencing hearing on March 27, 2024, she indicated that the investigation into Ms. Rodriguez had, since the State sent its initial letter in February, led to new allegations of misconduct dating back to December 2022.

The State responds by directing our attention to *Jackson v. State*, 164 Md. App. 679 (2005). In that case, this Court explained that newly discovered evidence does "not have a direct bearing on the merits of the trial" and thus does not warrant a new trial, if it is "merely impeaching." *Id.* at 697–98. The State argues that Ms. Gambino's goal in introducing the alleged newly discovered evidence in this case, that Ms. Rodriguez provided false information in other, unrelated CPS investigations, would have been "mere[] impeach[ment]" and that the circuit court didn't abuse its discretion in denying Ms. Gambino's motion for a new trial based on that evidence. In addition, the State asserts that Ms. Gambino overstates the significance of Ms. Rodriguez's testimony to its ability to prove its case. It contends that Ms. Rodriguez's "principal role, as a witness, was authenticating the video of her own interview of [R]," which the State played for the jury. According to the State, Ms. Rodriguez's testimony "did not really bear" on the central issue of the case, which was whether Ms. Gambino had coached R into making false allegations of sexual abuse against T.

We review the circuit court's denial of a motion for a new trial for abuse of discretion. *Mack v. State*, 300 Md. 583, 600 (1984), *abrogated by*, *Price v. State*, 405 Md. 10 (2008). "[T]he discretion afforded a trial judge 'is broad but it is not boundless.'" *Campbell v. State*, 373 Md. 637, 665 (2003) (*quoting Nelson v. State*, 315 Md. 62, 70 (1989)). We reverse a decision committed to the discretion of the trial court only if the court exercises that discretion in a manner that is "arbitrary or capricious, or without the letter or beyond the reason of the law." *Nelson*, 315 Md. at 70. Even so, we conduct our own interpretation of the relevant case law and don't defer to the interpretation of the trial

64

court. *Williams v. State*, 478 Md. 99, 131 (2022).

When reviewing a ruling on a motion for a new trial, the degree of deference this Court affords to the trial court's decision depends on the subsection of Maryland Rule 4-331 that brought the motion before that court. *See Jackson*, 164 Md. App. at 699. Rule 4-331(a) allows the trial court to grant a motion for a new trial "in the interest of justice" if the defendant files the motion within ten days after the jury returns a verdict. *Id.* In cases involving motions filed under Rule 4-331(a), "when the judge is considering the core question of whether justice has been done" and the answer depends on his "evaluation of the character of the testimony and of the trial," *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 57 (1992), we will "[r]arely, if ever," reverse for abuse of discretion. *Jackson*, 164 Md. App. at 702–04. Rule 4-331(c) provides an extended window for filing a motion for a new trial under limited circumstances. Md. Rule 4-331(c)(1). It allows the trial court to grant a new trial based on "newly discovered evidence" that "could not have been discovered by due diligence in time to move for a new trial" under Rule 4-331(a) if the defendant files a motion within one year of sentencing. *Id.* The deference we afford to the trial court when reviewing its decision on a motion filed under Rule 4-331(c) is more constrained. *See Jackson*, 164 Md. App. at 702–04. "[A] trial judge has virtually no 'discretion' to refuse to consider newly discovered evidence that bears directly on the question of whether a new trial should be granted" and should grant a new trial "if newly discovered evidence clearly indicates that the jury has been misled." *Buck*, 328 Md. at 58.

In this instance, Ms. Gambino filed her initial motion for a new trial under Rule 4-331(a) on February 2, 2024, exactly ten days after the jury rendered its verdict on January

65

23. This initial motion was on other grounds not relevant to her newly-discovered-evidence argument on appeal. After she received notice of Ms. Rodriguez's alleged misconduct from the State on February 22, she filed her supplemental motion for a new trial based on newly discovered evidence on February 26, outside of the ten-day window for filing a motion under Rule 4-331(a). As a result, we review the circuit court's denial of her supplemental motion as a denial of a motion for a new trial filed under Rule 4-331(c). Because the court didn't refuse to consider the newly discovered evidence and because that evidence didn't "clearly indicate[] that the jury [was] misled," *Buck*, 328 Md. at 58, we find that the court did not abuse its discretion in denying Ms. Gambino's supplemental motion for a new trial.

To determine if newly discovered evidence "clearly indicates that the jury [was] misled" and warrants a new trial, 328 Md. at 58, the trial court applies the two-step test set forth in *Yorke v. State*, 315 Md. 578 (1989), and restated in *Campbell v. State*, 373 Md. 637 (2003), and *Jackson. But see Hunt v. State*, 474 Md. 89, 114 (2021) (modifying two-part test in *Yorke* for actual innocence proceedings). *First*, as a "'threshold question,'" the court must decide if the newly discovered evidence proffered by the moving party would have been somehow "'material'" to the outcome of the trial.[9] *Yorke*, 315 Md. at 583, 585–86

---

[9] As an additional threshold inquiry, the court must conclude that the evidence presented is in fact "newly discovered evidence which could not have been discovered by due diligence" within ten days of the jury rendering its verdict. Md. Rule 4-331(c). The moving party bears the burden of establishing "to the satisfaction of the court that [they] acted with due diligence," *Love v. State*, 95 Md. App. 420, 431 (1993), or, more specifically, that they "act[ed] reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and the facts known to [them]." *Argyrou v. State*, 349 Md. 587, 605 (1998). Ms. Gambino produced a letter showing that the State

Continued . . .

(*quoting Stevenson v. State*, 299 Md. 297, 302 (1984)); *Campbell*, 373 Md. at 654–55; *Jackson*, 164 Md. App. at 696–97. If the court concludes that the newly discovered evidence satisfies the threshold requirement of materiality, it then must evaluate whether the evidence "may well have produced a different result, that is, there was a substantial or significant possibility that the verdict of the trier of fact would have been affected." *Yorke*, 315 Md. at 588; *Campbell*, 373 Md. at 655; *Jackson*, 164 Md. App. at 707–09 (*quoting Yorke*, 315 Md. at 588). We agree with the circuit court that the newly presented evidence in this case was neither material nor had a "substantial or significant possibility" of affecting the jury's verdict.

Newly discovered evidence is not material to the outcome of a case if it is "merely impeaching." In *Jackson*, this Court explained the difference between evidence that is "merely impeaching" and thus immaterial, and evidence that, although "coincidentally impeaching," is nevertheless material because it is "directly exculpatory . . . on the merits":

> Newly discovered evidence that a State's witness had a number of convictions for crimes involving truth and veracity or had lied on a number of occasions about other matters might have a bearing on that witness's testimonial credibility, but would not have a direct bearing on the merits of the trial under review. Such evidence would constitute collateral impeachment and would, therefore, be "merely impeaching." . . . If the newly discovered evidence, on the other hand, was that the State's witness had actually testified falsely on the core merits of the case under review, that evidence, albeit coincidentally

---

was unaware that Ms. Rodriguez had provided false documentation in other cases until after the ten-day window for filing a motion under Rule 4-331(a) had passed and informed Ms. Gambino after it became aware. We defer to the circuit court's decision to treat the evidence of Ms. Rodriguez's alleged misconduct as "newly discovered" based on these undisputed facts.

> impeaching, would be directly exculpatory evidence on the merits and could not, therefore, be dismissed as "merely impeaching."

164 Md. App. at 697–98.[10] In that case, a jury convicted Mr. Jackson of two counts of child sex abuse for acts he committed against his minor daughter. *Id.* at 684–85. At trial, Mr. Jackson's daughter testified against him as the State's key witness. *Id.* at 691. Defense counsel learned later that the day after Mr. Jackson's trial, his daughter allegedly told her cousin that her mother and stepfather had "forced [her]" to testify against him. *Id.* Mr. Jackson filed a motion for a new trial, alleging that the statement his daughter made to her cousin was "newly discovered evidence" that entitled him to a new trial. *Id.* at 691. At the motions hearing, however, Mr. Jackson's daughter denied making any such statement to her cousin and maintained that she had testified truthfully at trial. *Id.* at 692–93.

We held in *Jackson* that even assuming the newly discovered evidence of the victim's alleged statement to her cousin was credible, it wasn't material to the outcome of the case because it was "merely impeaching." 164 Md. App. at 698. The victim's cousin didn't allege that the victim admitted to lying, "only that she admitted to testifying under strong pressure" from her parents. *Id.* So if Mr. Jackson was able to use this evidence at

---

[10] The State points out rightly that after this Court decided *Jackson*, in *Snead v. State*, 224 Md. App. 99 (2015), we noted that a "court may not dismiss a petition [for writ of actual innocence] based on the 'overly rigid' classification of the type of evidence described." *Id.* at 113. But unlike *Jackson*, *Snead* dealt not with the denial of a motion for a new trial but of a petition for writ of actual innocence. In *Snead*, we recognized that a trial court could permissibly find that the "impeaching" or "merely impeaching" distinction, first developed in the context of a motion for a new trial, was "overly rigid" specifically "'in the context of § 8-301 petitions for writs of actual innocence.'" *Id.* at 112 (*quoting State v. Hunt*, 443 Md. 238, 263–64 (2015)).

trial, the Court reasoned, he could use it only to attack her credibility collaterally rather than to prove that her testimony was untruthful directly. *Id.* at 698–99. And because the newly discovered evidence "bore on [the victim's] testimonial credibility, but not directly on the substance of her testimony," the Court held that the evidence was "merely impeaching" and, consequently, not material. *Id.*

In *Campbell*, a case referenced heavily in *Jackson*, the Supreme Court of Maryland also grappled with the question of whether certain newly discovered evidence was "impeaching" but still material or "merely impeaching" and immaterial. 373 Md. at 670–72. After a jury convicted Mr. Campbell of murder, his counsel received evidence "that a key State's witness in [his case] had . . . 'falsely accused another person of murder in an unrelated case.'" *Jackson*, 164 Md. App. at 697 (*quoting Campbell*, 373 Md. at 644). The Court held that the newly discovered evidence was "merely impeaching" because it "involved a collateral matter and was cumulative to" multiple other pieces of evidence that Mr. Campbell introduced to impeach the State's witness at trial. *Campbell*, 373 Md. at 670–71. The Court added that even if the newly discovered evidence was material, the trial court did not abuse its discretion by deciding that there was not a "substantial or significant possibility" that it would have affected the jury's verdict based on its cumulative and collateral nature. *Id.* at 671–72.

Here, we agree with the circuit court that the newly discovered evidence that Ms. Rodriguez made false statements in CPS investigations unrelated to Ms. Gambino's case is "merely impeaching" and would not have been material to the outcome of her case. Like the evidence of the victim's alleged statement to her cousin in *Jackson*, 164 Md. App. at

698, and although evidence that Ms. Rodriguez provided false documentation in other CPS cases could be used to collaterally attack her "testimonial credibility," that evidence would have no direct bearing on "the substance" of her testimony in Ms. Gambino's case. *Id.* Put differently, Ms. Gambino has not presented evidence that Ms. Rodriguez "actually testified falsely on the core merits of [her] case . . . ." *Id.* That sort of evidence would be "be directly exculpatory . . . on the merits" and would undoubtedly have been material to the outcome of her trial. *Id.* Instead, the new evidence here could establish only that Ms. Rodriguez "lied on a number of occasions about other matters"—the hallmark of "mere[] impeach[ment]." *Id.* In this respect, this case is directly analogous to *Campbell*, where the Court concluded that newly discovered evidence that the State's key witness at Mr. Campbell's murder trial had "accused falsely another person of murder in an unrelated case" was "merely impeaching." 373 Md. at 644.

Even if the newly discovered evidence of Ms. Rodriguez's alleged misconduct was material, the circuit court didn't abuse its discretion by deciding that there was not a "substantial or significant possibility" that it would have affected the jury's verdict. *See Campbell*, 373 Md. at 671–72. Ms. Rodriguez's testimony at trial largely recounted her forensic interview with R on April 4, 2023 and the interview she observed via closed-circuit live feed on April 27, 2023. The State submitted into evidence recordings of both interviews, and Ms. Gonzalez, who conducted the April 27 interview, later testified about what she observed. Ms. Rodriguez also testified about a voicemail and text messages that Ms. Gambino sent her after the April 4 interview to tell her that R had made a new disclosure. The State offered a copy of these text messages into evidence. Ms. Rodriguez

70

did testify about two unrecorded conversations with Ms. Gambino, one over the phone before the April 4 interview and one with Ms. Gambino and her supervisor after the April 27 interview, during which she stated that she told Ms. Gambino not to talk to R about the allegations against T. Ms. Gambino confirmed in her testimony that CPS told her not to ask R questions about the allegations.

The trial judge considered carefully the newly discovered evidence that Ms. Rodriguez provided false documentation in unrelated cases in the context of all the evidence presented at the trial. Having "felt the pulse of the trial" and "rely[ing] on his own impressions" of that trial as he was entitled to do, *Campbell*, 373 Md. at 672, the judge determined "that the case [against Ms. Gambino] hinged on the assertion that" she rendered her child a CINA by exposing her "to Child Welfare Services Forensic interviews." At the motions hearing prior to sentencing, the judge characterized Ms. Rodriguez's testimony as it related to this core issue as "parrot[ing] what can be verified by the video and the audio" recording of her interview with R. He recognized that Ms. Rodriguez gave details about unrecorded conversations with Ms. Gambino, but ultimately found it "immaterial" to the jury's decision "whether or not [Ms. Gambino] was told not to discuss [the case] with [R]" because "she clearly had the background to understand how the operation worked because of her line of work." We cannot say that this conclusion was in any way "arbitrary or capricious, or without the letter or beyond the reason of the law." *Nelson*, 315 Md. at 70. The court's well-considered decision was based on its opportunity to observe and assess the full body of evidence presented at trial and to identify the key issues for resolution by the jury. Because the circuit court neither "refuse[d] to consider newly discovered

evidence" bearing "directly on the question of whether a new trial should be granted" nor abused its discretion in finding that the newly discovered evidence did not "clearly indicate[] that the jury ha[d] been misled," *Buck*, 328 Md. at 58, we hold that the court did not abuse its discretion when it denied Ms. Gambino's motion for a new trial.

> 2. *The circuit court did not abuse its discretion when it quashed Ms. Gambino's subpoena to CPS.*

*Second*, Ms. Gambino argues that the circuit court abused its discretion and committed a "miscarriage of justice" when it quashed the subpoena she served on CPS to obtain records related to the agency's investigation into Ms. Rodriguez. After the State informed Ms. Gambino of the investigation, she served a subpoena on CPS requesting information that included, but was not limited to, "[c]omplete records of any disciplinary proceedings involving" Ms. Rodriguez, including any "findings or conclusions"; "[a]ll investigation notes, reports, and documents authored by" Ms. Rodriguez in relation to R's case; and "[t]he entirety of [Ms. Rodriguez's] personnel file." Neither the State nor the Office of the County Attorney opposed the subpoena and, at the motions hearing before Ms. Gambino's sentencing hearing on March 27, 2023, counsel for the County Attorney's Office expressed the belief that Ms. Gambino was "entitled to the records." Because by law the Office of the County Attorney cannot release CPS records without a court order, counsel for the County Attorney's Office asked the judge to sign a proposed order to release the records in redacted form for disclosure only to "the parties' attorneys." After hearing arguments from the parties on Ms. Gambino's supplemental motion for a new trial, the trial judge quashed the subpoena to CPS "[f]or the reasons [he] stated" for denying her motion

72

for a new trial.

As an initial matter, we address whether Ms. Gambino was entitled to inspect the records and information she requested from CPS via her subpoena. Ms. Gambino asserts that by quashing her subpoena to CPS, the court "fundamentally undermined some of the bedrock principles of justice and due process" and deprived her "of the right to show reasonable doubt" by "denying [her] access to likely exculpatory evidence." The State replies that Ms. Gambino failed to offer the circuit court "any argument" about "what [she] reasonably hoped to discover" by gaining access to the records and thus failed to meet her burden to establish a right to their disclosure. We hold that Ms. Gambino didn't have a right to access the records.

In *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), the Supreme Court of the United States was asked to decide "whether and to what extent a State's interest in the confidentiality of its investigative files concerning child abuse must yield to a criminal defendant's . . . right to discover favorable evidence." *Id.* at 42–43. After Pennsylvania charged Mr. Ritchie with various sexual offenses against his thirteen-year-old daughter, he served the state's CPS agency with a subpoena seeking access to his daughter's records related to the charges against him. *Id.* at 43. The agency refused to release the records and Mr. Ritchie moved for sanctions, arguing "that he was entitled to the information because the file might contain the names of favorable witnesses, as well as other, unspecified exculpatory evidence." *Id.* at 43–44. The trial court denied Mr. Ritchie's motion and quashed the subpoena. *Id.*

On appeal, the Supreme Court held that under the Due Process Clause of the

Fourteenth Amendment, Mr. Ritchie was entitled to have the trial court conduct an *in camera* (*i.e.,* private) review of the records to determine if the files contained any information that was "material" to his claim of innocence. *Ritchie*, 480 U.S. at 57–60. The Court defined "materiality" as creating a "'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 57 (*quoting United States v. Bagley*, 473 U.S. 667, 682 (1985)). The Court noted that because neither the parties nor the trial court had examined the entire file, it was impossible to determine if the records contained material evidence absent *in camera* review. *Id.* at 57–58. The Court also concluded that *in camera* review before the disclosure of any information to Mr. Ritchie would protect Pennsylvania's "compelling interest in protecting its child-abuse information" adequately. *Id.* at 60; *see also Zaal v. State*, 326 Md. 54, 61, 72, 76 (1992) (criminal defendant seeking disclosure of educational records—which are subject to a lesser degree of confidentiality than CPS records—must "demonstrate a genuine need for the information that outweighs the privacy interest" of the person to whom the records belong (citation omitted)).

The circumstances in this case differ from those in *Ritchie*. Ms. Gambino issued her subpoena to CPS after trial, at a motions hearing, where the only remaining issue for the court to resolve prior to sentencing was whether she was entitled to a new trial based on newly discovered evidence. Unlike in *Ritchie*, where the Court found that it was impossible to know whether Mr. Ritchie's daughter's CPS records contained material evidence without *in camera* review, 480 U.S. at 57–58, this trial court was able to determine that the

74

requested records were immaterial without reviewing their contents. Ms. Gambino explained to the court that she was seeking records relating to CPS's investigation into Ms. Rodriguez because she believed they contained evidence that Ms. Rodriguez "provided falsified information in unrelated proceedings . . . ." The court concluded properly that even if CPS turned over the records to Ms. Gambino, nothing she discovered within them would entitle her to a new trial because the information she sought was "merely impeaching" and unrelated to the merits of her case. We agree that Ms. Gambino did not "demonstrate a genuine need" for the records strong enough to overcome Maryland's "compelling interest in protecting its child-abuse information," *see Ritchie*, 480 U.S. at 60; *Zaal*, 326 Md. at 72, and was not entitled either to *in camera* review of, or direct access to, the requested records.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**